### 2393. REDD *et al. v.* THE STATE.

1. In the expression "any notorious act of public indecency, tending to debauch the morals," as used in Penal Code of 1895, § 390, the word "indecency" has a somewhat narrower meaning than it has in ordinary popular speech; yet it is broader in meaning than the phrase "exposure of the person." A criminal public indecency may be committed without any improper exposure of the human body.

2. What is decent and what is indecent are determined by the sensibilities and moral standards of a people, as evolved from generation to generation along with their civilization. What is decent in one period may be indecent in another, and vice versa.

3. Whether an act is decent or indecent depends upon the time, the place, and all the circumstances surrounding its commission, including the intention, actual or implied, of the actor.

4. When, by general consensus of the people and practical unanimity of public opinion, an act tending to debauch the morals is understood to be offensive to the common instincts of decency if done under particular circumstances, that act when so done is, in contemplation of law, a notorious act of indecency.

5. The barrier which has been erected by social decorum between persons of different sexes, and which prevents the one from intentionally and unnecessarily intruding upon the attention of the other the sexual act and all other things directly suggestive of it, is a fundamental of decency, well recognized and understood by the people of this State at the present time. A public and intentional or wanton violation of the dictates of decency in this respect is an act of public indecency, within the purview of section 390 of the Penal Code of 1895.

6. For a man intentionally or wantonly to cause a bull and a cow to engage in sexual intercourse near a public highway and in full view of it, knowing that a woman and a number of children were so situated that they could hardly fail to see the spectacle, and that they would likely be offended by it, is an act of criminal, notorious public indecency.

Accusation of misdemeanor; from city court of LaGrange— Judge Harwell. January 1, 1910.

Argued March 8,—Decided April 6, 1910.

*F. M. Longley,* for plaintiff in error.

*Henry Reeves, solicitor, Hatton Lovejoy, E. A. Jones,* contra.

POWELL, J. The defendants were prosecuted under the Penal Code of 1895, §390, which provides, among other things, that "any person who shall be guilty of open lewdness, or any notorious act of public indecency, tending to debauch the morals," shall be punished as for a misdemeanor. The charge is that the defendants were guilty of a notorious act of public indecency, tending to debauch the morals, in that they, in a public place, adjacent to a highway and in the presence of a lady and several children, caused a bull and a cow to copulate. The proof was that these two men, having been entrusted with a cow that was in heat, for the purpose of taking her to the bull which was confined in a pasture adjacent to the public road, put the cow in the pasture, and tied her to the fence next to the road, and called the bull to her there. The copulation between the animals thus took place publicly, though there

was a branch and a thicket about a hundred feet away in which the act could have been done privately.   About thirty feet away, and just across the road, were a woman and several children.   The defendants denied seeing these persons, but the proof was against them as to that.   There was ample evidence to sustain the proposition that the defendants wilfully, or at least in reckless disregard of the sensibilities of the woman and the children, put the bull to the cow in their presence.   The road seems to have been a much frequented highway, for several persons passed in vehicles while the act complained of was in progress.

The contention presented by counsel for plaintiff in error is that no offense is charged or shown,—that the phrase "public indecency," as used in this section of the Penal Code, relates only to indecent exposure of the human person.   The court has been so fortunate as to have both sides of the question ably argued before it; and we must admit that the decision of the question is not unattended with doubt.   There are in this State no offenses in force by reason of the common law; in a sense, all our crimes and misdemeanors are statutory; yet we have by statute given recognition to many offenses which were known to the common law and which have not been defined otherwise than by the use of the general terms anciently used to describe them; and in such cases we look to the common law for more specific definition.   Public indecency was a common-law offense, included under the more general head of indictable nuisances.   What research we have been able to make as to the old English cases on the subject tends to corroborate the assertion of the distinguished counsel who, by a fortuitous combination of circumstances, appeared for the plaintiffs in error, that no case can be found at common law where a person was convicted for exhibiting or exposing any of the lower animals in the act of sexual intercourse, or in any other way tending to shock the sensibilities of the spectators.   Indeed, as to prosecutions for public indecency (omitting cases of the use of obscene language in the presence of females and of the exhibition of obscene and offensive prints, pictures, statuary, etc.,—omitted because they are distinct offenses, not here involved), all the old cases, and nearly all the modern ones, so far as the facts have been reported, appear to be cases in which were involved exposures of the human body.   It may therefore be conceded that the reported cases, considered as

37

physical precedents, do seem to support the view presented by the plaintiffs in error.

It is true, too, that it is contrary to the genius of our law, as well as repugnant to the popular notions of juridic justice, that punishable offenses should be left undefined. Intuitively the courts find themselves seeking for and declaring, by construction, limitations in the way of definition, where the legislature has spoken loosely. In the case of McJunkins *v*. State, 10 Ind. 140, 145, it was said: "The term 'public indecency' has no fixed legal meaning—is vague and indefinite, and can not in itself imply a definite offense. And, hence, the courts, by a kind of judicial legislation, in England and the United States have usually limited the operation of the term to public displays of the naked person, the publication, sale, or exhibition of obscene books and prints, or the exhibition of a monster—acts which have a direct bearing on public morals, and affect the body of society. Thus, it will be perceived that so far as there is a legal meaning attached to the term, it is different from, and more limited than, the commonly accepted meaning given by Webster [in his dictionary] to the word 'indecency'." This dictum has been widely quoted with approval by the courts and text-writers; and it may be noted that it found its way into general lexicography, for the Century Dictionary cites it in connection with the definition of the word "indecency." Yet, despite the wide currency that has been given the dictum in the McJunkins case, despite the paucity of physical precedents to the contrary, it must be noticed by every one who has had the occasion to pursue the question that neither the courts nor the text-writers have been willing to commit themselves fully to the proposition that the limitations and definition attempted in that case are wholly accurate, or that the enumeration of acts there stated is exhaustive. For instance, we frequently find in cases and text-books the statement that whatever openly outrages decency and is injurious to public morals is a misdemeanor at common law and is indictable as such. See Russell, Crimes (9th Am. Ed. 449; Id. (7th Eng. Ed., 1st Can. Ed.) 1875; Bish. New Crim. Law, §1125 (2); 29 Cyc. 1315; State *v*. Rose, 32 Mo. 560; State *v*. Walter, 2 Marv. (Del.) 444; Com. *v*. Holmes, 17 Mass. 336; State *v*. Appling, 25 Mo. 315 (69 Am. D. 469); Com. *v*. Sharpless, 2 Serg. & R. (Pa.) 91 (7 Am. Dec. 632); Grisham *v*. State, 2

Yerg. (Tenn.) 589; Knowles *v.* State, 3 Day (Conn.), 103, 108; Rex *v.* Crunden, 2 Camp. 89; 4 Blackstone's Com. 64.

The reticence of the courts to violate the chastity of their reports with narratives of indecent acts may account for the fact that we are able to find so few reported cases of public indecency not involving exposure of the person. For example, in *Brigman* v. *State,* 123 *Ga.* 505 (51 S. E. 504), a conviction for public indecency was sustained, but the printed report contains no account of the specific act by which the defendant violated the statute. An inspection of the original record shows that it involved no exposure of the person. For the purpose of insulting a young lady who had refused his offer of escort, the defendant in that case emitted an indecent noise in her presence, while she was on the highway in company with another young man. Indeed, in the old and frequently referred to case of Sir Charles Sedley, which was tried during the reign of Charles II (see 1 Siderf. 168), the offense of public indecency alleged against the prisoner was not only that he stood naked on a balcony in a public part of London, but also that he threw down certain "offensive liquor" among the people passing along the highway. In Nolin *v.* Franklin, 4 Yerg. (12 Tenn.) 163, the Supreme Court of Tennessee, on the authority of the common law, held that "the showing of a stud horse in a town is a nuisance." However, we are not prepared to hold that our statute intended to adopt the common law to this extreme.

After careful reflection upon the matter, we have reached the conclusion that our statute, based as it is upon the common law, is broad enough to cover all notorious public and indecent conduct, tending to debauch the public morals, even though it be unattended by any exposure of the human body. If this is not so, then our law, broadly as it has been drawn, is not adequate to protect the public in this State from many acts shockingly obscene and tending to lower the moral standards. For while we have statutes against the use of obscene and vulgar language, against the exhibition of prints, pictures, and other artificial representations of obscene things, we have no statute other than the one now under review against indecent shows and public exhibitions of things not pictorial in their nature. Can it be said that it would not be a notorious act of public indecency if, in a theater or other similar place, one should exhibit trained animals, say monkeys dressed as men and women,

and cause them to go through the act of sexual intercourse in the presence of the audience? Can it be doubted that this would tend to debauch the public morals? Yet it would involve no exposure of the human body. Cases even worse than this,—cases so extreme that even the duty of speaking plainly, imposed upon us by the nature of the question here involved, would not excuse the indelicacy of mentioning them,—and yet involving no exposure of the person, may be imagined. The language of the law, taken in its natural and ordinary sense, is broad enough to reach such cases, and we do not feel warranted in so limiting its meaning as to leave such cases out of its province. Hard as it is to define what notorious public indecency means, we feel reasonably sure that it means in law, as well as in common vernacular, more than what the expression "indecent exposure of person" includes. However, we · should keep in mind that the word "indecency," as used in the statute, has not so broad a meaning as it has in popular speech. An act may be unconventional, may be such as to give offense to the finer sensibilities, may relate to acts which would bring a blush (real or feigned) to the cheeks of the prudish, and yet not be indecent. To determine whether an act is indecent within the purview of the statute, the time, the place, the circumstances, and the motives of the actors must be considered. An act may be done under some circumstances without the imputation of indecency, when a similar act done in the presence of women or children would be highly indecent. Many useful, important, and even absolutely necessary acts are to be lawfully accomplished only in private. What is decent and what is indecent is largely a matter of general public opinion, and, hard as it is to define the words "public indecency," most of us who have ordinary sensibilities know what it means. By common consent of the people there are certain things which all know and understand are not to be done publicly, or at least in mixed company. A fair test to determine whether an act is notoriously indecent within the purview of this law is to consider whether the general run of the citizenry of the State would readily recognize it as such (all the attendant facts and circumstances and the motives of the actor being considered), and also whether it tends to debauch the morals. We believe in this case that these defendants, even though they were possessed of less than normal moral sensibilities, knew that it was indecent for them

to put the bull to the cow in plain view of the highway and in the presence of this lady and her children, some of them little girls, when the necessary performance could have been accomplished privately with but little trouble and inconvenience.

As was said by Chief Justice Perkins in the case of Ardery *v.* State, 56 Ind. 328, 329, 330: "Immediately after the fall of Adam, there seems to have sprung up in his mind an idea that there was such a thing as decency and such a thing as indecency; that there was a distinction between them; and since that time the ideas of decency and indecency have been instinctive in, and, indeed, parts of, humanity." As tending to preserve chastity, society has erected as one of its inviolable decencies that sexual intercourse, lawful or unlawful, and all things directly suggestive of it, shall be kept private, and has established that it is a shameful and an indecent thing for a person of one sex, especially of the male sex, intentionally, publicly, and unnecessarily to bring before the gaze or hearing of a person of the opposite sex the act of sexual intercourse, or things closely associated with it. Anything which tends to break down this standard of decency tends to promote unchastity, and thereby to debauch the public morals. If one man may, without violating the law, deliberately cause his beasts to copulate on the highway and in the very presence of one woman rightfully there, another may lawfully bring his beasts for the same purpose to the school grounds where children are assembled, or to the church yard while the congregation is there. Can such things be allowed without offending the common instincts of decency in the strictest sense of the word, or without tending to impair the present standard of morals recognized as proper between the sexes?

It is true, as suggested by distinguished counsel for the plaintiffs in error, that according to the construction here announced, the patriarch Jacob, standing at the public watering place and holding the striped rods before Laban's bulls, rams, and he-goats when they leaped, in order that the young might be marked with stripes, would have been guilty of public indecency. Perhaps so. But as able counsel for the State has replied, it will not do to measure modern morals according to the standards of ancient and biblical times. King Solomon with his thousand wives would not be tolerated in Georgia; and King David, he the man after God's own heart, could hardly justify his whole life according to the provi-

sions of the Penal Code of this State.    Our standards of morals have advanced since then, and our standards of decency have advanced accordingly.    The times,—the prevailing state of public morality at the particular period,—more largely than any other one thing, determine what the decencies and indecencies of that particular day and generation shall be.    Many things regarded (by law as well as by secular opinion) a hundred years ago as being indecent are not so regarded now; and on the other hand, the present age has developed decencies and indecencies unknown to or unobserved by our forefathers.

We conclude that according to the prevailing social standards in this State, and according to the notions of decency and indecency now commonly recognized among our people, the act of the defendants was a notorious act of public indecency, tending to debauch the morals.    This, of course, is based on the assumption that the defendants had the intention of obtruding the spectacle upon the gaze of those present, or that they acted so wantonly or recklessly in the matter as to raise the legal imputation of such an intention.    The act of the animals was not the thing that was indecent.    The indecent thing was the conduct of the defendants in intentionally or wantonly displaying this act to the woman and the children.    A moment's thought will develop this distinction.    A lady of refined sensibilities, who, though in mixed company, should casually come upon animals in the sexual act, might feel a sense of shame, her refined tastes might be offended; yet it would be to attribute a mock modesty to her to say that her sense of decency was outraged.    Yet, if some man were to catch the animals so engaged, and bring them before her and say, either by spoken language or by conduct capable of conveying an equivalent meaning, "Look at this," her sense of decency would be offended—not by the act of the animals, but by the act of the man.

*Judgment affirmed.*