**PARMELEE v. UNITED STATES.**

No. 7332.

United States Court of Appeals for the District of Columbia.

Decided May 14, 1940.

Rehearing Denied May 12, 1940.

VINSON, Associate Justice, dissenting.

Edmund D. Campbell, of Washington, D. C., for appellant.

David A. Pine, U. S. Atty., and H. L. Underwood and John L. Laskey, Asst. U.

S. Attys., all of Washington, D. C., for appellee.

Before GRONER, Chief Justice, and MILLER and VINSON, Associate Justices.

MILLER, Associate Justice.

The Collector of Customs at the Port of Washington, in the District of Columbia, seized six books, entitled "Nudism in Modern Life," which had been imported by Maurice Parmelee via the mails, from England. The United States Attorney filed a libel in the court below seeking the confiscation and destruction of the books. The court determined that they were properly subject to libel and should be destroyed. The applicable statute,[1] so far as pertinent, reads as follows: "All persons are prohibited from importing into the United States from any foreign country * * * any obscene book, pamphlet, paper, writing, advertisement, circular, print, picture, drawing, or other representation, figure, or image on or of paper or other material * * *." The lower court found as follows:

"4. Upon examination of the book the Court finds nothing in the written text thereof which could be considered obscene or immoral. The case of the Government is predicated upon photographic illustrations which appear at various places in the book.

"5. The illustrations which are asserted to be obscene apparently have no relevancy to the written text at the place in which each of said photographic illustrations is set in the book. The said photographs or illustrations, upon examination, are obscene and within the condemnation of the statute under the authority of which seizure was made and the libel filed."

On argument, it was conceded by the government that the text of the books and most of the photographs are unobjectionable. All that remains in dispute, therefore, is whether the books are objectionable, within the meaning of the statute, because of the presence therein of three or four photographs in which appear full front views of nude female figures, and two photographs in which nude male and female figures appear together. The photographs complained of are uncolored and apparently unretouched and are approximately 2¼ x 3¼ inches in size. The human figures which appear therein are approximately 1½ inches in height.

Our decision of the case requires no expression of opinion, judicial or otherwise, concerning the merits or demerits of nudity as it may be practiced or professed. The only question before us is whether the book "Nudism in Modern Life" is obscene, in the light of the applicable standard intended to be established by the statute. But obscenity is not a technical term of the law and is not susceptible of exact definition.[2] Although the word has been variously defined,[3] the test applied in many of the earlier cases was that laid down by

---

[1] Section 305(a), Title III of the Tariff Act of June 17, 1930, 46 Stat. 688, 19 U.S.C.A. § 1305(a).

[2] Timmons v. United States, 6 Cir., 85 F. 204, 205. See generally, Alpert, Judicial Censorship of Obscene Literature, 52 Harv.L.Rev. 40.

[3] Thus: Offensive to chastity of mind or to modesty; expressing or presenting to the mind or view something that delicacy, purity, and decency forbid to be exposed (Webster, New International Dictionary); offensive to modesty, decency, or chastity; impure; unchaste; indecent; lewd (Century Dictionary; Black's Law Dictionary; Timmons v. United States, 6 Cir., 85 F. 204, 205); offensive to the senses; repulsive; disgusting; foul; filthy (Holcombe v. State, 5 Ga.App. 47, 50, 62 S.E. 647, 648; Williams v. State, 130 Miss. 827, 843, 94 So. 882, 884); calculated to corrupt, deprave and debauch the morals of the people (See United States v. Males, D.C. Ind., 51 F. 41, 42; Commonwealth v. Landis, 8 Phila. 453; 2 Wharton, Criminal Law, 12th Ed. 1932, § 1942. See, also, Schroeder, "Obscene" Literature and Constitutional Law [1911] 33 et seq.) and promote violation of the law (Missouri v. Pfenninger, 76 Mo.App. 313, 317); of such character as to deprave and corrupt those whose minds are open to such immoral influences (Regina v. Hicklin, [1868] L.R. 3 Q.B. 360, 369, 371; United States v. Moore, W.D.Mo., 129 F. 159, 161); calculated to lower that standard which we regard as essential to civilization, or calculated, with the ordinary person, to deprave his morals or lead to impure purposes (Dunlop v. United States, 165 U.S. 486, 17 S.Ct. 375, 41 L.Ed. 799); licentious and libidinous and tending to excite feelings of an impure or unchaste character (Duncan v. United States, 9 Cir., 48 F.2d 128, 131–133, certiorari denied, 283 U.S. 863, 51 S.Ct. 656, 75 L.Ed. 1468); having relation to sexual impurity (Swearingen v. United States, 161 U.S. 446, 451, 16 S.Ct. 562, 40 L.Ed.

Lord Chief Justice Cockburn in Regina v. Hicklin,[4] as follows: "* * * whether the tendency of the matter charged as obscenity is to deprave and corrupt those whose minds are open to such immoral influences, and into whose hands a publication of this sort may fall."[5] And the rule was applied to those portions of the book charged to be obscene rather than to the book as a whole.[6] But more recently this standard has been repudiated, and for it has been substituted the test that a book must be considered as a whole, in its effect, not upon any particular class, but upon all those whom it is likely to reach.[7] Thus considered, obscenity is, as Judge Learned Hand has said, "a function of many variables, and the verdict of the jury is not the conclusion of a syllogism of which

they are to find only the minor premiss, but really a small bit of legislation ad hoc, like the standard of care."[8] But in every case it is a question of law for the court to determine, in the first instance, whether the challenged publication can have the tendency attributed to it by the government, and it is only when that determination has been made in the affirmative that the jury is called upon to decide whether it has such a tendency in fact.[8a] In our opinion, the book "Nudism in Modern Life" cannot reasonably be said to fall within the prohibition of the statute.

Probably the fundamental reason why the word obscene is not susceptible of exact definition is that such intangible moral concepts as it purports to connote, vary in meaning from one period to another.[9] It

---

765; Dysart v. United States, 272 U.S. 655, 657, 47 S.Ct. 234, 71 L.Ed. 461; Rosen v. United States, 161 U.S. 29, 16 S.Ct. 434, 480, 40 L.Ed. 606. See United ed States v. Limehouse, 285 U.S. 424, 52 S.Ct. 412, 76 L.Ed. 843); tending to stir the sex impulses or to lead to sexually impure and lustful thoughts (United States v. One Book Called "Ulysses", S.D.N.Y., 5 F.Supp. 182, 184, affirmed, 2 Cir., 72 F.2d 705; United States v. One Obscene Book Entitled "Married Love", S.D.N.Y., 48 F.2d 821; United States v. One Book Entitled "Contraception", S. D.N.Y., 51 F.2d 525); tending to corrupt the morals of youth or to lower the standards of right and wrong, specifically as to the sexual relation (People v. Berg, 241 App.Div. 543, 272 N.Y.S. 586).

[4] [1868] L.R. 3 Q.B. 360, 369.

[5] MacFadden v. United States, 3 Cir., 165 F. 51, writ of error denied, 213 U. S. 288, 29 S.Ct. 490, 53 L.Ed. 801; Knowles v. United States, 8 Cir., 170 F. 409; United States v. Bennett, Fed.Cas. No. 14,571, 16 Blatch. 338; United States v. Clarke, E.D.Mo., 38 F. 500; United States v. Harmon, D.Kan., 45 F. 414, reversed on other grounds, 50 F. 921; United States v. Smith, E.D.Wis., 45 F. 476; United States v. Wightman, W.D.Pa., 29 F. 636; United States v. Bebout, N.D. Ohio, 28 F. 522. See generally, Alpert, Judicial Censorship of Obscene Literature, 52 Harv.L.Rev. 40, 53.

[6] United States v. Kennerley, S.D.N.Y., 209 F. 119, 120.

[7] United States v. Levine, 2 Cir., 83 F.2d 156, 157; United States v. One Book Entitled Ulysses, 2 Cir., 72 F.2d 705; United States v. Dennett, 2 Cir., 39 F.2d 564, 76 A.L.R. 1092.

[8] United States v. Levine, 2 Cir., 83 F. 2d 156, 157. See United States v. Ken-

nerley, S.D.N.Y., 209 F. 119, 121: "If letters must, like other kinds of conduct, be subject to the social sense of what is right, it would seem that a jury should in each case establish the standard much as they do in cases of negligence."

[8a] Magon v. United States, 9 Cir., 248 F. 201, 203; United States v. One Obscene Book Entitled "Married Love", S.D.N.Y., 48 F.2d 821; United States v. Dennett, 2 Cir., 39 F.2d 564, 568, 76 A.L.R. 1092.

[9] Cardozo, Paradoxes of Legal Science (1927) 37: "Law accepts as the pattern of its justice the morality of the community whose conduct it assumes to regulate." People v. Miller, 155 Misc. 446, 279 N.Y.S. 583, 584: "The criterion of decency is fixed by time, place, geography, and all the elements that make for a constantly changing world. A practice regarded as decent in one period may be indecent in another." Redd v. State, 7 Ga.App. 575, 581, 582, 67 S.E. 709, 711, 712: "* * * it will not do to measure modern morals according to the standards of ancient and Biblical times. King Solomon with his thousand wives would not be tolerated in Georgia; and King David, he the man after God's own heart, could hardly justify his whole life according to the provisions of the Penal Code of this state. Our standards of morals have advanced since then, and our standards of decency have advanced accordingly. The times—the prevailing state of public morality at the particular period—more largely than any other one thing, determine what the decencies and indecencies of that particular day and generation shall be. Many things regarded (by law as well as by secular opinion) a hundred years ago as being indecent are not so

is customary to see, now, in the daily newspapers and in the magazines, pictures of modeled male and female underwear which might have been shocking to readers of an earlier era. An age accustomed to the elaborate bathing costumes of forty years ago might have considered obscene the present-day beach costume of halters and trunks. But it is also true that the present age might regard those of 1900 as even more obscene.[10]

With such considerations in mind, perhaps the most useful definition of obscene is that suggested in the case of United States v. Kennerley,[11] i. e., that it indicates "the present critical point in the compromise between candor and shame at which the community may have arrived here and now." But when we attempt to locate that critical point in the situation of the present case, we find nothing in the record to guide us except the book itself. The question is a difficult one, as to which the expert opinions of psychologists and sociologists would seem to be helpful if not necessary. Assumptions to the contrary which appear in some of the earlier cases,[12] reveal the profound ignorance of psychology and sociology[13] which prevailed generally, when those opinions were written. More recently, in the cases and textbooks, the desirability and pertinence of such evidence has been suggested.[14] Lacking such assistance in the present case, we can compensate for it in some measure by noticing, judicially, evidence which is thus available to us.

It cannot be assumed that nudity is obscene per se and under all circumstances. Even the application of the narrowest rule would not justify such an assumption. And, from the teachings of psychology[15] and sociology,[16] we know that the contrary

---

regarded now; and, on the other hand, the present age has developed decencies and indecencies unknown to or unobserved by our forefathers."

[10] People v. Miller, 155 Misc. 446, 279 N.Y.S. 583, 584: "The practice of 'bundling' approved in Puritan days would be frowned upon today. * * * Twenty-five years ago women were arrested and convicted for appearing on the beach attired in sleeveless bathing suits, or without stockings. * * * In 1906, the play 'Sappho' was suppressed because the leading lady was carried up a flight of stairs in the arms of a man. In 1907, Mary Garden was prevented from appearing in the opera 'Salome.' * * * What was regarded as indecent in the days of the Floradora Sextette, is decent in the days of the Fan and Bubble Dances."

[11] S.D.N.Y., 209 F. 119, 121. See Towne v. Eisner, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372, L.R.A. 1918D, 254: "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."

[12] People v. Muller, 96 N.Y. 408, 412, 48 Am.Rep. 635.

[13] See generally, Herbert Spencer, The Study of Sociology (1903) 1–11.

[14] United States v. One Book Entitled Ulysses, 2 Cir., 72 F.2d 705, 706; Halsey v. New York Soc. for Suppression of Vice, 234 N.Y. 1, 6, 136 N.E. 219, 220; United States v. Levine, 2 Cir., 83 F.2d 156, 157; 2 Wigmore, Evidence, 2d Ed. 1923, § 935: "Modern psychology

is steadily progressing towards definite generalizations in that field, and towards practical skill in applying precise tests. Whenever such principles and tests can be shown to be accepted in the field of science, expert testimony should and will be freely admitted to demonstrate and apply them." See 1 id. § 662.

[15] Schroeder, "Obscene" Literature and Constitutional Law (1911) 306, quoting from Havelock Ellis, Psychology of Sex: Modesty, 39, and Erotic Symbolism, p. 15: "Nakedness is always chaster in its effects than partial clothing. A study of pictures or statuary will alone serve to demonstrate this. As a well-known artist, Du Maurier, has remarked (in Trilby), it is "a fact well known to all painters and sculptors who have used the nude model (except a few shady pretenders, whose purity, not being of the right sort, has gone rank from too much watching) that nothing is so chaste as nudity. Venus herself, as she drops her garments and steps on the model-throne, leaves behind her on the floor every weapon in her armory by which she can pierce to the grosser passions of men." Burton, in the Anatomy of Melancholy (Part III, Sec. ii, subsec. iii), deals at length with the "allurements of love," and concludes that the "greatest provocations of lust are from our apparel." ' "

[16] Sumner, Folkways (1906) 426: "* * * at the limit, that is at today's fashions, coquetry can be employed again, and a sense stimulus can be exerted again, by simply making variations on the existing fashions at the limit. It is impossible to eliminate the sense

stimulus, or to establish a system of societal usage in which indecency shall be impossible. The dresses of Moslem women, nuns, and Quakeresses were invented in order to get rid of any possible question of decency. The attempt fails entirely. A Moslem woman with her veil, a Spanish woman with her mantilla or fan, a Quakeress with her neckerchief, can be as indecent as a barbarian woman with her petticoat of dried grass. * * * It would be difficult to mention anything in Oriental mores which we regard with such horror as Orientals feel for low-necked dresses and round dances. Orientals use dress to conceal the contour of the form. The waist of a woman is made to disappear by a girdle. To an Oriental a corset, which increases the waist line and the plasticity of the figure, is the extreme of indecency—far worse than nudity. It seems like an application of the art of the courtesan to appeal to sensuality." 428: "An elderly lady says that when the present queen of England brought in, at her marriage, the fashion of brushing up the hair so as to uncover the ears, which had long been covered, it seemed indecent." 430, 431: "In the Italian novel Niccolo dei Lapi it is said in honor of the heroine that she never saw herself nude. It was a custom observed by many to wear a garment which covered the whole body even when alone in the bath. Erasmus gives the reason for this. The angels would be shocked at nakedness. He made it a rule for men. One should never, he says, bare the body more than necessary, even when alone. The angels are everywhere and they like to see decency as the adjunct of modesty." 431: "It results from the study of the cases that nakedness is never shameful when it is unconscious (Genesis iii, 7)." 434, 435: "It is very improper for a Chinese woman who has compressed feet to show them. Thomson gives a picture which shows the feet of a woman, but it was very difficult, he says, to persuade the woman to pose in that way. Chinese people would consider the picture obscene. No European would find the slightest suggestion of that kind in it. An Arab woman, in Egypt, cares more to cover her face than any other part of her body, and she is more careful to cover the top or back of her head than her face. It appears that if any part of the body is put under a concealment taboo for any reason whatever, a consequence is that the opinion grows up that it never ought to be exposed. Then interest may attach to it more than to exposed parts, and erotic suggestion may be connected with it." 436: "The natives of New Britain are naked, but modest and chaste. 'Nudity rather checks than stimulates.' The same is observed in English New Guinea. The men wear a bandage which does not conceal, but they attach to this all the importance which we attach to complete dress, and they speak of others who do not wear it as 'naked wild men.'" 437: "On the Uganda railroad, near Lake Victoria, coal-black people are to be seen, of whom both sexes are entirely naked, except ornaments. They are 'the most moral people in Uganda.' The Nile negroes and Masai are naked. In the midst of them live the Baganda who wear much clothing. The women are covered from the waist to the ankles; the men from the neck to the ankles, except porters and men working in the fields. * * * This character and their dress are accounted for by their long subjection to tyranny. They are 'profoundly immoral,' have indecent dances, and are dying out on account of the 'exhaustion of men and women by premature debauchery.'" 440: "The Japanese do not consider nudity indecent. A Japanese woman pays no heed to the absence of clothing on workmen. European women in Japan are shocked at it, but themselves wear dinner and evening dress which greatly shock Orientals." 446: "There is no 'natural' and universal instinct, by collision with which some things are recognized as obscene. We shall find that the things which we regard as obscene either were not, in other times and places, so regarded, any more than we so regard bared face and hands, or else that, from ancient usage, the exhibition was covered by a convention in protection of what is archaic or holy, or dramatic, or comical. In primitive times goblinism and magic covered especially the things which later became obscene. * * * As has been shown above, however, so soon as objects were attached to the body for any purpose whatever, the conventional view that bodies so distinguished were alone right and beautiful was started, and all the rest of the convention of ornament and dress followed."

II Pareto, The Mind and Society (1935) § 1374, n. 1: "The Adamites imitated the nakedness of Adam in Paradise before the Fall. * * * They went naked to their meetings and listened to their sermons and took their sacraments naked, thinking of their church, in fact, as Paradise itself."

I Lea, History of the Inquisition (1888) 147, 148: "It was during the preaching of this crusade [against the

view is held by social scientists.[17]

Nudity in art has long been recognized as the reverse of obscene.[18] Art galleries and art catalogues contain many nudes, ancient and modern. Even such a conservative source book as Encyclopaedia Britannica, contains nudes, full front view, male and female, and nude males and females pictured together and in physical contact.[19]

The use of nude figures and photographs in medical treatises and textbooks is also commonly practiced today. It was conceded on argument that this, also, constitutes an exception to the earlier prohibition. But this was not always true. In the earlier periods of medical history, censorship of scientific investigation was so restrictive that anatomical drawings alleged to represent the human body were made from studies of animals or upon a basis of pure hypothesis.[20] Later, as indicated by such

---

Albigenses] that villages and towns in Germany were filled with women who, unable to expend their religious ardor in taking the cross, stripped themselves naked and ran silently through the roads and streets."

[17] See generally, Schroeder, "Obscene" Literature and Constitutional Law (1911) c. XIII, Ethnographic Study of Modesty and Obscenity.

[18] People v. Muller, 96 N.Y. 408, 411, 48 Am.Rep. 635: "It is evident that mere nudity in painting or sculpture is not obscenity. Some of the great works in painting and sculpture as all know represent nude human forms. It is a false delicacy and mere prudery which would condemn and banish from sight all such objects as obscene, simply on account of their nudity. If the test of obscenity or indecency in a picture or statue is its capability of suggesting impure thoughts, then indeed all such representations might be considered as indecent or obscene. The presence of a woman of the purest character and of the most modest behavior and bearing may suggest to a prurient imagination images of lust, and excite impure desires, and so may a picture or statue not in fact indecent or obscene."

[19] Thus, in the article on Painting, in 17 Encyc. Brit., 14th Ed. 1932, 36–64D, there is a front view nude female (Plate VIII, 2) and a front view of nude males and females together (Plate XXIV, 7). In the article on Sculpture in 20 Encyc. Brit. (14th Ed. 1932) 198–217, there are front views of nude females (Plate V, 4 and 6; Plate VI, 8; Plate XVIII, 2 and 4). There are also front views of nude males (Plate IV, 8; Plate XIX, 8), and of nude males and females in physical contact (Plate IV, 2; Plate V, 8; Plate VI, 2; Plate XVIII, 3). In the article on Sculpture Technique, in 20 Encyc. Brit. (14th Ed. 1932) 217–231, there are front views of nude females (Plate VII, 1; Plate IX, 4); front views of nude males (Plate I, 1; Plate II, 6 and 8; Plate V, 7; Plate IX, 2); and a nude male and nude female in physical contact (Plate VIII, 3). These pictures in the Encyclopaedia Britannica are all larger than are the pictures which appear in Parmelee's book, and several of them—contra Parmelee—frankly emphasize sexual subjects.

[20] Clendening, Behind the Doctor (1933) 57, 58: "For nearly fifteen hundred years men had been teaching anatomy out of Galen [131–201 A.D.]. * * * A dog [in 1500] was the usual object to be dissected before the class. As the dissection progressed, the professor would read what Galen said on the subject. Sometimes Professor Sylvius would find something in the course of dissection of the dog which did not agree with Galen. If so, he gave his class to understand the dog was wrong. Sometimes he was unable to find a muscle or tendon or nerve or vein which he had meant to show. * * * The anatomical text of Guido de Vigevano, published in 1345, while it shows dissections, notes that the Church prohibits them."

Garrison, History of Medicine (1913) 149, 168: "Thoroughly as the great artists of the Renaissance may have studied external anatomy, yet dissecting for teaching purposes was still hampered by the theologic idea of the sanctity of the human body and its resurrection. Moreover, as very little anatomic material could be obtained among a sparse and slowly growing population, people were naturally averse to the possible dissection of friends or relatives. The anatomy of the schools was still the anatomy of Galen.

*                *                *

"Dissections, however, became more frequent [after 1500] and were regarded, in each case, as a particular and expensive social function, for which a special papal indulgence was necessary. The cadaver was first made 'respectable' by the reading of an official decree, and was then stamped with the seal of the university. Having been taken into the anatomic hall, it was next beheaded in deference to the then universal prejudice against opening the cranial cavity. The dissection was followed by such festivi-

cases as Regina v. Hicklin (1868),[21] and People v. Muller (1884),[22] the old censorship was relaxed to permit the use of such figures and photographs, provided the textbooks and treatises in which they appeared were restricted to use among practitioners and students.[23] No reasonable person at the present time would suggest even that limitation upon the circulation and use of medical texts, treatises and journals. In many homes such books can be found today; in fact standard dictionaries, generally, contain anatomical illustrations. It is apparent, therefore, that civilization has advanced far enough, at last, to permit picturization of the human body for scientific and educational purposes. That fact is decisive of the present case. The picturization here challenged has been used in the libeled book to accompany an honest, sincere, scientific and educational study and exposition of a sociological phenomenon and is, in our opinion, clearly permitted by present-day concepts of propriety.[24] There is, perhaps, as great or greater need for freedom of scientific research and exposition in this field as in any other.[25] And, at this point, it may be well to repeat that the

ties as band music or even theatrical performances. All this led in time to the building of the so-called anatomic theaters, notably those at Padua (1549), Montpellier (1551), and Basel (1588). In England the need for anatomic study led to the passing of the law of 1540 (32 Henry VIII, c. 42), authorizing the barbers and surgeons to use four bodies of executed criminals each year for 'anathomyes,' a provision which, however enlarged, remained substantially in force until the passing of the Anatomy Act of 1832."

[21] L.R. 3 Q.B. 360, 367.

[22] 96 N.Y. 408, 413, 48 Am.Rep. 635.

[23] In Commonwealth v. Landis, 8 Phila. 453, it was held that publications of a scientific or medical character containing illustrations exhibiting the human form, while decent and moral if used in a classroom, would be obscene if wantonly exposed in the open markets. In United States v. Smith, E.D.Wis., 45 F. 476, a medical treatise, treating in wholesome language of the sex organs, which was distributed promiscuously, was held to be obscene. In United States v. Chesman, E.D.Mo., 19 F. 497, an illustrated pamphlet, purporting to be on the subject of treatment of spermatorhoea and impotency and consisting partially of extracts from standard medical works, was held to be, when circulated generally, immoral and obscene. In Burton v. United States, 8 Cir., 142 F. 57, a scientific book was held to be obscene, notwithstanding the contention, assumed to be true, that its contents had been approved by physicians and consisted of accurate and scientific information on the topics discussed; that ignorance upon these topics was quite general and that this ignorance frequently resulted in disease, physical infirmity, unhappiness and misery, which the information given in the book was designed to prevent; that as a whole the book was calculated to be of value to the medical practitioner and to men and women in the marriage relation; and even that some portion of the text was from standard medical works. In United States v. Harmon, D. Kan., 45 F. 414, reversed on other grounds, 50 F. 921, an article concerning the sexual relation was held obscene notwithstanding it was written solely for the purpose of improving sexual habits, and correcting sexual abuses. But see Hanson v. United States, 7 Cir., 157 F. 749; United States v. One Book Entitled "Contraception", S.D.N.Y., 51 F.2d 525; United States v. One Book Entitled Ulysses, 2 Cir., 72 F.2d 705.

[24] In the following cases, the material was held to be nonsensual: United States v. One Obscene Book Entitled "Married Love", S.D.N.Y., 48 F.2d 821 (a book written in an effort to explain to married people how their mutual sex life could be made happier); United States v. One Book Entitled "Contraception", S.D. N.Y., 51 F.2d 525 (a treatment of the theory, history, and practice of birth control); United States v. Dennett, 2 Cir., 39 F.2d 564, 76 A.L.R. 1092 (pamphlet written for sex instruction of adolescents). Cf. Dysart v. United States, 272 U.S. 655, 47 S.Ct. 234, 71 L.Ed. 461 (holding nonobscene a post card advertising a retreat for unmarried pregnant women which was mailed to women of refinement).

[25] Herbert Spencer, The Study of Sociology (1903) c. I: Our Need of It 5, 6: "But while the prevalence of crude political opinions among those whose conceptions about simple matters are so crude, might be anticipated, it is surprising that the class disciplined by scientific culture should bring to the interpretation of social phenomena, methods but little in advance of those used by others. Now that the transformation and equivalence of forces is seen by men of science to hold not only throughout all inorganic actions, but throughout all organic actions; now that even mental changes are recognized as the correlatives of cerebral changes, which also conform to this principle;

question is not whether nudity in practice is justifiable or desirable. All would agree that cancer, leprosy, and syphilis are highly undesirable; still, it is recognized, generally, by normal, intelligent persons, that there is need for scientific study, exposition and picturization of their manifestations.[26]

The statute involved in the present case was interpreted in United States v. One Book Entitled Ulysses,[27] and the decision in that case is equally applicable here. "It is settled," says the court in the Ulysses case, "that works of physiology, medicine, science, and sex instruction are not within the statute, though to some extent and among some persons they may tend to promote lustful thoughts." It should be equally true of works of sociology, as of physiology, medicine and other sciences—to say nothing of general literature and the arts—that "where the presentation, when viewed objectively, is sincere, and the erotic matter is not introduced to promote lust and does not furnish the dominant note of the publication", the same immunity should apply.[28] Cases relied upon by the government, in which publication and distribution were "wholly for the purpose of profitably pandering to the lewd and lascivious" have no relevancy to the present case.[29]

As it is conceded that the entire

---

and now, that there must be admitted the corollary, that all actions going on in a society are measured by certain antecedent energies, which disappear in effecting them, while they themselves become actual or potential energies from which subsequent questions arise; it is strange that there should not have arisen the consciousness that these highest phenomena are to be studied as lower phenomena have been studied—not, of course, after the same physical methods, but in conformity with the same principles."

Sumner and Keller, III The Science of Society (1927) 2246, 2247: "The chief trouble with 'sociology' is that it is not qualifying as a science by subordinating its types of therapeutics to that which corresponds, within its range, to anatomy and physiology. * * * The art of living reacts upon the apprehension of and the adjustment to immutable conditions; and a knowledge of the conditions is always a prior necessity. * * * Under some Darwin of the future, such studies can result in the apprehension of societal laws; then the race can make a farsighted and accurately planned campaign against its problems instead of a series of desultory and disconnected engagements. What is now needed is some such collection of scientific materials as Darwin found at hand, a collection assembled by many patient and obscure workers intent, not upon self-glorification, but the discovery of truth."

[26] See United States v. One Book Entitled "Contraception", S.D.N.Y., 51 F.2d 525; United States v. One Book Called "Ulysses", S.D.N.Y., 5 F.Supp. 182, 185: "It is only with the normal person that the law is concerned."

[27] 2 Cir., 72 F.2d 705, 707. See also, United States v. One Obscene Book Entitled "Married Love", S.D.N.Y., 48 F.2d 821; United States v. One Book Entitled "Contraception", S.D.N.Y., 51 F.2d 525.

[28] United States v. One Book Entitled Ulysses, 2 Cir., 72 F.2d 705, 707. See United States v. Dennett, 2 Cir., 39 F. 2d 564, 76 A.L.R. 1092; United States v. One Book Entitled "Contraception", S. D.N.Y., 51 F.2d 525; United States v. One Obscene Book Entitled "Married Love", S.D.N.Y., 48 F.2d 821; United States v. Levine, 2 Cir., 83 F.2d 156. See United States v. Kennerley, S.D.N.Y., 209 F. 119, 120, in which Judge Learned Hand, in criticizing the doctrine of the Hicklin case, said: "I question whether in the end men will regard that as obscene which is honestly relevant to the adequate expression of innocent ideas, and whether they will not believe that truth and beauty are too precious to society at large to be mutilated in the interests of those most likely to pervert them to base uses. Indeed, it seems hardly likely that we are even to-day so lukewarm in our interest in letters or serious discussion as to be content to reduce our treatment of sex to the standard of a child's library in the supposed interest of a salacious few, or that shame will for long prevent us from adequate portrayal of some of the most serious and beautiful sides of human nature. * * * Yet, if the time is not yet when men think innocent all that which is honestly germane to a pure subject, however little it may mince its words, still I scarcely think that they would forbid all which might corrupt the most corruptible, or that society is prepared to accept for its own limitations those which may perhaps be necessary to the weakest of its members."

See also, Halsey v. New York Soc. for Suppression of Vice, 234 N.Y. 1, 136 N. E. 219; People v. Wendling, 258 N.Y. 451, 180 N.E. 169, 81 A.L.R. 799.

[29] See Lynch v. United States, 7 Cir., 285 F. 162, 163.

text of "Nudism in Modern Life" is inoffensive, and that only a few of the twenty-three illustrations are questionable, it is obvious that the latter do not furnish the dominant note of the publication. The determining question is, in each case, whether a publication, taken as a whole, has a libidinous effect.[30] In the present case, as in the Ulysses case, the book as a whole is certainly not obscene; here, as there, the book has "such evident truthfulness in its depiction of certain types of humanity, and is so little erotic in its result, that it does not fall within the forbidden class."[31] The author has been known for many years as a well qualified writer in the field of sociology. His textbooks have been long known and used in the colleges and universities of this country. The photographs used in the book here involved have definite relevancy to the written text, even though there are no specific references therein by plate number; and it cannot fairly be said that they were introduced to promote lust or to produce libidinous thoughts. The author expresses his point of view in the preface to the book as follows: "The illustrations depict better than words can describe the natural and normal life, and the beautiful and healthful methods and activities of a gymnosophic society. They portray them as actually applied in several European countries by many thousands of men, women and children of all classes, occupations and conditions, while the text discusses its scientific, hygienic, cultural, aesthetic, ethical and humanitarian significance."

In fact, it is only because social scientists are still working under conditions of enforced self-deception, similar to those which prevailed in the early days of the medical profession, that the propriety of the present book is questioned. Until phenomena such as those discussed in "Nudism in Modern Life" can be studied on a realistic basis, it is reasonable to expect as great professional inadequacy in the solution of social problems as was true of attempts to solve problems affecting the health of the physical body, prior to the present-day development of medical science. There are still some unexplored areas of medical science, but there are many unexplored areas of social science. If anything, there is needed today greater patience and greater tolerance concerning research in sociology than in medicine; looking to the day when social scientists can advise not only courts, but the people generally; just as physicians, chemists and other physical scientists do today.[32] "Democracy today needs the social scientists, both inside and outside the universities. It needs to free them to think with all possible penetration, wherever that thinking may lead. New ideas about human relations and institutional adjustment should be fully, honestly and hospitably analyzed. Society should be most deeply concerned not with ridiculing failures or condemning those whose findings it does not approve, but with aiding that small minority of pioneers whose work in the social studies is reaching up to new levels of scientific achievement. Such persons are to be found in universities, in government and in private life. No greater contribution to the disinterested comprehension of today's issues could be made than by affording these able men and women full opportunity to make their work genuinely effective."[33] It cannot reasonably be contended that the purpose of the pertinent statute is to prevent scientific research and education. To uphold the decision of the lower court would contribute to just that result. So to interpret it would be to abandon the field, in large measure, to the charlatan and the fakir.[34] "The foolish judgments of Lord Eldon about one

---

[30] United States v. Levine, 2 Cir., 83 F.2d 156, 157; Alpert, Judicial Censorship of Obscene Literature, 52 Harv.L. Rev. 40, 54, 67.

[31] United States v. One Book Entitled Ulysses, 2 Cir., 72 F.2d 705, 707. See United States v. Levine, 2 Cir., 83 F.2d 156, 158: "The standard must be the likelihood that the work will so much arouse the salacity of the reader to whom it is sent as to outweigh any literary, scientific or other merits it may have in that reader's hands; * * *."

[32] See 4 Wigmore, Evidence, 2d Ed. 1923, §§ 1923, 1975.

[33] Raymond B. Fosdick, A Review for 1939, The Rockefeller Foundation (1940) 41, 42.

[34] See United States v. Levine, 2 Cir., 83 F.2d 156, 157: "This earlier doctrine [of the Hicklin and related cases] necessarily presupposed that the evil against which the statute is directed so much outweighs all interests of art, letters or science, that they must yield to the mere possibility that some prurient person may get a sensual gratification from reading or seeing what to most people is innocent and may be delightful or enlightening. No civilized com-

hundred years ago, proscribing the works of Byron and Southey, and the finding by the jury under a charge by Lord Denman that the publication of Shelley's 'Queen Mab' was an indictable offense are a warning to all who have to determine the limits of the field within which authors may exercise themselves." [35]

Reversed.

VINSON, Associate Justice, dissenting.

The libel of the instant book required the District Court to decide whether it fell within the purview of § 305 of the Tariff Act of 1930.[1] The court, sitting without a jury as a judge of both law and fact, found that it did. The only question presented by this appeal is whether the court followed correctly the mandate of Congress.

The relevant provisions of § 305 are as follows:

"All persons are prohibited from importing into the United States from any foreign country * * * any obscene book, * * * picture * * *: Provided further, That the Secretary of the Treasury may, in his discretion, admit the so-called classics or books of recognized and established literary or scientific merit, but may, in his discretion, admit such classics or books only when imported for noncommercial purposes.

"* * * Upon the adjudication that such book or matter thus seized is of the character the entry of which is by this section prohibited, it shall be ordered destroyed and shall be destroyed. * * *

"In any such proceeding any party in interest upon demand may have the facts at issue determined by a jury and any party may have an appeal or the right of review as in the case of ordinary actions or suits."

The book in the instant case was not admitted under special dispensation of the Secretary. Hence, if obscene within the meaning of the statute, it clearly is subject to destruction.

In reviewing the District Court judgment we must first ascertain what connotation is to be given the term obscene as it appears in the statute prohibiting the importation of obscene books. It seems clear, contrary to implications in the majority opinion, that the purity of the author's motive and incidental claim the book may have to literary, scientific or educational value is not decisive.[2] Under an English statute prohibiting the sale of obscene

---

munity not fanatically puritanical would tolerate such an imposition, and we do not believe that the courts that have declared it, would ever have applied it consistently. As so often happens, the problem is to find a passable compromise between opposing interests, whose relative importance, like that of all social or personal values, is incommensurable."

[35] United States v. One Book Entitled Ulysses, 2 Cir., 72 F.2d 705, 708. In Vol. X of Lord Campbell's Lives of the Lord Chancellors, 5th Ed. 1868, 257, the author speaks of a decision by Lord Eldon concerning a poem by Lord Byron and says: "* * * it must have been a strange occupation for a judge who for many years had meddled with nothing more imaginative than an Act of Parliament, to determine in what sense the speculations of Adam, Eve, Cain, and Lucifer are to be understood, and whether the tendency of the whole poem be favourable or injurious to religion." In a footnote, the author quotes, for comparative purposes, a statement by Sir Walter Scott who, he states, was "ever an observer of decency, and a friend to religion and morality," as follows: "I accept, with feelings of great obligation, the flattering proposal of Lord Byron to prefix my name to the very grand and tremendous

drama of Cain. I may be partial to it, and you will allow I have cause; but I do not know that his muse has ever taken so lofty a flight amid her former soarings. He has certainly matched Milton on his own ground."

[1] 46 Stat. 688, 19 U.S.C.A. § 1305.

[2] The author's motive is of no consequence. United States v. One Book Entitled Ulysses, 2 Cir., 72 F.2d 705, 708; United States v. Dennett, 2 Cir., 39 F.2d 564, 76 A.L.R. 1092. Likewise, it seems clear under the statute that incidental claim to literary, scientific or educational merit will not save a book otherwise obscene. The statutory prohibition is absolute—forbidding importation of "any" obscene book. Moreover, there is a proviso that "the Secretary of the Treasury may, in his discretion, admit the so-called classics or books of recognized and established literary or scientific merit, but may, in his discretion, admit such classics or books only when imported for noncommercial purposes". Under elementary canons of statutory construction, it seems clear that, apart from this exception not here involved, the prohibition of the statute against the importation of "any obscene book" is not subject to relaxation by reason of the latter's claim to literary, scientific or educational-

literature, Cockburn, C. J., stated in Regina v. Hicklin, 3 Q. B. 360, 371 that: "the test of obscenity is this: Whether the tendency of the matter charged as obscenity is to deprave and corrupt those whose minds are open to such immoral influences, and into whose hands a publication of this sort may fall". In this country we have several so-called federal obscenity statutes. In addition to the Tariff Act provision here invoked, Congress has provided criminal sanctions against importation, transportation by common carrier, or through the mails, of any "obscene, lewd, or lascivious" book.[3] With certain modifications the obscenity test of Regina v. Hicklin has been adopted by the Federal Courts in interpreting all of these statutes.[4] As modified by these decisions the test might be stated as follows: A book is obscene when in the aggregate sense of the community[5] the tendency of the objectionable matter, considered with the book as a whole,[6] is to arouse lustful thought.[7] That such a test of obscenity is required when the term' is associated in a criminal statute with lewdness and lasciviousness does not, of course, mean that it is sufficiently broad for the term as it appears in the Tariff Act. Indeed, such a definition seems unduly restrictive of the normal meaning of the term and there is some judicial support for a broader, more inclusive definition.[8] Assuming, however, that the stated definition

al merit. Cf. United States v. Chesman, C.C., E.D.Mo., 19 F. 497; United States v. Smith, D.C., E.D.Wis., 45 F. 476. This does not mean, of course, that the character of a publication does not enter into a determination of *whether it is obscene*. It is believed that United States v. Ulysses, supra, recognizes the general rule, merely emphasizing this last proposition. But cf. United States v. Levine, 2 Cir., 83 F.2d 156, 158. It may be observed that permitting importation of this particular book can do little to advance the cause of science and education—it appears from the record that a domestic edition of the same book is being freely sold.

3 35 Stat. 1138, amended 41 Stat. 1060, 18 U.S.C.A. § 396 (importing and transporting obscene books); 36 Stat. 1339, 18 U.S.C.A. § 334 (mailing obscene matter).

4 See Note 76 A.L.R. 1099.

5 It is believed that the cases establish that the "standard of the community" has been substituted for the "standard of the weak and susceptible", at least where there is no evidence of sales to the latter. See United States v. Harmon, D.C.Kan., 45 F. 414, 417; United States v. Kennerley, D.C.N.Y., 209 F. 119, 121; United States v. Dennett, 2 Cir., 39 F.2d 564, 76 A.L.R. 1092; United States v. One Book Called "Ulysses", D.C., 5 F.Supp. 182, 184; Id., 2 Cir., 72 F.2d 705; United States v. Levine, 2 Cir., 83 F.2d 156, 158.

6 Clark v. United States, 8 Cir., 211 F. 916. See also cases cited supra note 5.

7 "The word 'obscene' ordinarily means something that is offensive to chastity, something that is foul or filthy, and for that reason is offensive to pure-minded persons. That is the meaning of the word in the concrete. But when used, as in the statute under which this indictment is framed, to describe the character of a book, pamphlet, or paper, it means a book, pamphlet, or paper containing immodest and indecent matter, the reading whereof would have a tendency to deprave and corrupt the minds of those into whose hands the publication might fall whose minds are open to such immoral influences". United States v. Clarke, D.C., E.D.Mo., 38 F. 732, 733. It seems settled that the term obscene as used in the statutes proscribing obscene books refers to lust rather than to immodesty or indelicacy. See cases cited in Note 76 A.L.R. 1099. See also Anonymous, 1 Fed.Cas. 1024, No. 470; United States v. Three Cases of Toys, 28 Fed.Cas. 112, No. 16,499. It is stated in some of the cases that the term is to be given the same meaning it had in common law actions for obscene libel. Swearingen v. United States, 161 U.S. 446, 451, 16 S.Ct. 562, 40 L. Ed. 765; Knowles v. United States, 8 Cir., 170 F. 409, 412; United States v. Males, D.C., 51 F. 41, 42.

8 United States v. One Obscene Book Entitled "Married Love", D.C., S.D.N.Y., 48 F.2d 821, 823, Woolsey, J.:

"In *Murray's Oxford English Dictionary* the word 'obscene' is defined as follows:

" 'Obscene—1. Offensive to the senses, or to taste or refinement; disgusting, repulsive, filthy, foul, abominable, loathsome. Now somewhat arch.

" ' 2. Offensive to modesty or decency; expressing or suggesting unchaste or lustful ideas; impure, indecent, lewd.'

\* \* \*

"The book 'Married Love' does not, in my opinion, fall within these definitions of the words 'obscene' \* \* \* in any respect."

For other definitions of the term obscene see note 3 of the majority opinion. See also United States v. Harmon, D.C., 45 F. 414, 417; Holcombe v. State,

740

is applicable, can we say that the District Court erred in holding this book obscene within the meaning of the statute?

Preliminarily it may be well to recall some of the fundamental principles respecting the function of an appellate court. First of all, it is settled that in ordinary actions an appeal is limited to matters of law.[9] In § 305 of the Tariff Act it is provided that "In any such proceeding [libel of an allegedly obscene book] any party in interest upon demand may have the facts at issue determined by a jury and any party may have an appeal or the right of review *as in the case of ordinary actions* or suits".[10] (Italics supplied) These proceedings partake, therefore, of the nature of ordinary actions at law. In such actions the verdict of the jury on questions of fact is final and conclusive.[11] Where a jury is waived the finding of the court on factual issues is given the same conclusive weight.[12] There is in respect to every factual question, however, a preliminary legal question—could reasonable men differ on the factual issue in the light of the proof.[13] If so, the question is one for the fact trier. It is settled that whether a book is obscene presents a question of fact, if reasonable men could differ on that question.[14] From this it follows that, where there has been a jury verdict (or a finding by the court where a jury is waived) that a book is obscene, an appellate court cannot disturb that determination unless it is prepared to say that no reasonable man could have found as did the jury (or court).

We come then to the question, can it be said that no reasonable man could find the book in question obscene within the meaning of the statute? In this connection it is important to recall that under the decisions a book is obscene if in the aggregate sense of the community the tendency of the questionable matter, considered with the book as a whole, is to arouse lustful thought. That is to say—the book must be judged by reference to the "standard of the community".

"Laws of this character are made for society in the aggregate, and not in particular. So, while there may be individuals

---

5 Ga.App. 47, 50, 62 S.E. 647 (in the federal mails statute the term "obscene" is deprived of its usual broad meaning by reason of its association with the other terms "lewd or lascivious"). It is significant to note that the statute prohibiting use of the mails for obscene books, as originally enacted, read as does the present provision in the Tariff Act, "no obscene book". Act of July 8, 1872, 17 Stat. 302. Later the mails statute was amended to read "no obscene, lewd or lascivious" book. Act of March 3, 1873, 17 Stat. 599. See United States v. Loftis, D.C.Or., 12 F. 671, 672. It seems clear that the provision of the Tariff Act against the importation of "any obscene book" might be given a broader application than the mails statute.

9 Rev.Stat. § 1011, 28 U.S.C.A. § 879, as amended by 45 Stat. 54, 28 U.S.C.A. §§ 861a, 861b. Bengoechea Macias v. De La Torre & Ramirez, 1 Cir., 84 F.2d 894, 895; Salt Bayou Drainage Dist. v. Futrall, 8 Cir., 72 F.2d 940, 942; Security Nat. Bank v. Old Nat. Bank, 8 Cir., 241 F. 1, 6; United States ex rel. Smith v. Stewart, 55 App.D.C. 134, 135, 2 F.2d 936; Barbour v. Moore, 10 App.D.C. 30, 50.

10 46 Stat. 688, 19 U.S.C.A. § 1305.

11 Columbia Aid Ass'n v. Sprague, 50 App.D.C. 307, 271 F. 381; O'Dea v. Clark, 46 App.D.C. 274.

12 In ordinary actions this court has stated that, where trial by jury has been waived, the finding of the District Court on questions of fact cannot be reviewed. Neely Electric Construction & Supply Co. v. Browning, 25 App.D.C. 84, 87; Shelley v. Wescott, 23 App.D.C. 135, 140. It is axiomatic that the findings of the court where a jury is waived are given the weight attached to a verdict. See 28 U.S.C.A. § 773. Whether there is substantial evidence to support the finding presents, of course, a legal question. Even in equity practice the rule is settled in this jurisdiction that the findings of the trial court on matters of fact cannot be disturbed unless clearly wrong. Russell v. Wallace, 58 App. D.C. 357, 30 F.2d 981 (reasonable time a question of fact); Hazen v. Hawley, 66 App.D.C. 266, 271, 88 F.2d 217.

13 Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720; Chicago G. W. Ry. Co. v. Price, 8 Cir., 97 F. 423, 427.

14 United States v. One Obscene Book Entitled "Married Love", D.C., S.D.N.Y., 48 F.2d 821, 824; United States v. Dennett, 2 Cir., 39 F.2d 564, 76 A.L.R. 1092; United States v. Levine, 2 Cir., 83 F.2d 156; United States v. Smith, D.C., E.D.Wis., 45 F. 476, 477; Knowles v. United States, 8 Cir., 170 F. 409, 410; United States v. Kennerley, D.C., S.D. N.Y., 209 F. 119, 120. Cf. Dreiser v. John Lane Co., 183 App.Div. 773, 171 N.Y.S. 605.

and societies of men and women of peculiar notions or idiosyncrasies, whose moral sense would neither be depraved nor offended by the publication now under consideration, yet the exceptional sensibility, or want of sensibility, of such cannot be allowed as a standard by which its obscenity or indecency is to be tested. Rather is the test, what is the judgment of the aggregate sense of the community reached by it? What is its probable, reasonable effect on the sense of decency, purity, and chastity of society, extending to the family, made up of men and women, young boys and girls,—* * * Who is to deem, who is to judge, whether a given publication impinges upon the general sense of decency? * * * The answer to this is, that asserted violations of this statute, * * * must be left to the final arbiter under our system of government,—the courts. The jury, the legally constituted triers of the fact under the constitution, is to pass upon the question of fact. Under our institutions of government the panel of 12 are assumed to be the best and truest exponents of the public judgment of the common sense. Their selection and constitution proceed upon the theory that they most nearly represent the average intelligence, the common experience and sense, of the vicinage; and these qualifications they are presumed to carry with them into the jury-box, and apply this average judgment to the law and the facts. Sitting as the court does in this case, in the stead of the jury, it may not apply to the facts its own method of analysis or process of reasoning as a judge, but should try to reflect in its findings the common experience, observation, and judgment of the jury of average intelligence." [15]

The majority opinion recognizes that the book in question must be judged by the "community standard" but it suggests in ascertaining "* * * the present critical point in the compromise between candor and shame at which the community may have arrived here and now" [16] that "the expert opinions of psychologists and sociologists would seem to be helpful if not necessary". While such opinions might be helpful, none appear in the record. Furthermore, it must be remembered that social scientists do not alway reflect, or even intend to reflect, the sentiment of the community. Their opinions would seem relevant only if directed to the question of what the present community conscience is, in reference to a book of this character. It would seem clear that a sociologist's opinion on the standards of foreign communities (set forth at some length in note 16 of the majority opinion) would be almost entirely irrelevant to determination of what the standard of the community is in this country.

The District Court was of the view that the book with the pictures in question was obscene within the meaning of the statute, i. e., that it offended the present community standard. From their opinion it seems clear that the majority of this court would agree that just a few years ago a book of this character containing the pictures in question would unquestionably have been regarded as obscene. Undoubtedly, thought changes in respect to what is obscene. The "judgments of Lord Eldon about one hundred years ago, proscribing the works of Byron and Southey" do not damn him as foolish so much as they support the thesis of the majority opinion that the content of the term "obscene" is geared to the clock. The majority have evidently concluded that the country-wide sense of decency has altered in the past few years to the extent that in the present day only a Rip Van Winkle could regard the book in question as obscene. That I cannot believe. Accepting the premise that "time marches on", I am nevertheless unable to agree that we have here and now "progressed" to the point where a publication of this character is, beyond the possibility of reasonable difference of opinion, acceptable to the community. This publication, it must be repeated, is to be judged in the light of the present day standard, not that of the world of tomorrow. It is significant in this respect to note that when the governing provision was last re-enacted in 1930, Congress inserted for the first time a proviso indicating that it did not regard the "so-called classics or books of recognized and established literary or scientific merit" as ipso facto without the prohibition against the importation of obscene books. [17]

I think it important to emphasize that decision of this case calls, not for the individual judge's personal opinion, but, for a

---

[15] United States v. Harmon, D.C., 45 F. 414, 417.

[16] United States v. Kennerley, D.C., 209 F. 119, 121.

[17] See note 2 supra.

742

gauging of the present community sentiment.[18] It seems obvious to me that a court should rarely attempt that task as a matter of law. Certainly, it seems difficult to conclude that no reasonable man could say that this book offends the community standard and, with a District Court finding that the book with its pictures is obscene, I am unable to understand how my brethren can stand on that proposition. I not only think reasonable men might differ on that question which in itself requires an affirmance, I approve the result reached by the District Court that the matter in question is within the prohibition of the statute. I must therefore dissent.

---

[18] See note 5 supra.