## BURSTEIN v. UNITED STATES.

### No. 12173.

United States Court of Appeals
Ninth Circuit.

Dec. 28, 1949.

Rehearing Denied Jan. 30, 1950.

Caspar Willard Weinberger, San Francisco, Calif., for appellant.

James M. Carter, U. S. Atty., Ernest A. Tolin, Chief Asst. U. S. Atty., Norman W. Neukom and Herschel E. Champlin, Assts. U. S. Atty., Los Angeles, Calif., for appellee.

Before DENMAN, Chief Judge, and ORR and POPE, Circuit Judges.

POPE, Circuit Judge.

Burstein was found guilty of depositing for mailing an obscene, lewd, lascivious and filthy book entitled "Confessions of a Prostitute", and of depositing for mailing a mimeographed letter giving information as to where and how the book might be obtained, contrary to 18 U.S.C.A. § 334* (old). On this appeal his principal contentions are: (1) that the book is not obscene as a matter of law; (2) that the court gave the jury an erroneous definition of obscenity; and (3) that the trial judge denied him effective representation by counsel.

The book in question had been copied by Burstein from a book published by The Macaulay Company entitled "Sterile Sun". It had been issued by that company in a special edition "the sale of which is limited to physicians, psychiatrists, sociologists, social workers, educators and other persons having a professional interest in the psychology of adolescents". It carried an introduction written by the Rev. John Howard Melish which emphasized the statement that the book was written for the professional group mentioned and that it should not be placed on the shelves of a public library for "young people with a pornographic urge to read". It was shown that the book "Sterile Sun" was found in

the public library upon the restricted shelves. Appellant made copies of the book, omitting the statement of the publisher respecting limitation of sale, and the introductory note mentioned. He testified that he made the copies, giving it a new title, with the consent of the publisher. Appellant advertised the sale of the book under the new title by mailing circulars describing the book as "spicy", and "too sharp for ordinary consumption", and quoting a few especially salacious and suggestive lines from the book.[1] This he did under an alias.

■  We do not feel called upon to make any extended review of the book "Confessions of a Prostitute" for the purpose of explaining why in our opinion the court properly submitted to the jury the question whether the book was obscene within the meaning of the statute. Reading the book discloses that its generally suggestive and salacious character measured up to the advance promises contained in appellant's advertising circulars. We hold that this publication was such that it was for the jury to determine whether the book was obscene. Magon v. United States, 9 Cir., 248 F. 201, 203.

■  In charging the jury the court said: "Matter is obscene, lewd, or lascivious, within the meaning of the quoted statute,

* 1948 Revised Criminal Code, 18 U.S.C.A. § 1461.

1. The circular was as follows: "Unusual Publications—Dear Friend: If you are a mature and broadminded adult and can take it and if you are one of the many people who enjoy reading really spicy books not obtainable elsewhere, I have a 20,000 word book which I'm sure will open your eyes and make you sit up. It is called "Confessions of a Prostitute" and is a privately printed edition. Being very much too sharp for ordinary consumption, it is therefore not available in bookstores or elsewhere.

"I'll quote a line or two to give you a small idea of what to expect in this startling daring volume—'He went crazy when he saw my legs. He said they were perfect, he kept kissing them and running his hands over them. I knew he wasn't so young and had to get a thrill up.'—Try this one—'He dumped me on the bed and almost killed me, he got right on top of

me, I couldn't breathe hardly.' You must understand that I cannot say too much as this letter may fall into the wrong hands, so these are just a few of the milder lines. The entire book runs in the same vein and will give you thrill after thrill—if you care for this type of reading.

"Naturally there are other items available which you will be able to obtain after we become better acquainted.

"So, if you are the proper person for this type of literature, simply enclose a five dollar bill (and well worth it) with this letter, fill in your name and address below and mail At Once in the enclosed envelope. Your copy will be dispatched to you promptly, and you will be advised of other items on hand or being prepared. Yours in good faith, George H. Lane.— Here is my five dollars, Rush the book to me At Once.—Name .... Age .... Address .... City .... State ..... . This offer is good for Five Days only."

if it is offensive to the common sense of decency and modesty of the community, and tends to suggest or arouse sexual desires or thoughts in the minds of those who by means thereof may be depraved or corrupted in that regard. The true inquiry in this case is whether or not the publication charged to have been obscene was in fact of that character, and if it was, and the defendant knew its contents at the time he deposited it in the mail, it is not material that he, himself, did not regard it as obscene." The jury later requested additional instructions on the same point whereupon the court repeated the definition just quoted and added: "You are instructed that the words 'obscene, lewd, or lascivious', as used in the statute from which I have just quoted to you, have the meaning of that which is offensive to chastity and modesty. They mean that form of indecency which is calculated to promote the general corruption of morals. The true test to determine whether a writing is non-mailable as obscene, lewd, or lascivious is whether its language has a tendency to deprave or corrupt the morals of those whose minds are open to such influences and into whose hands it may fall by allowing or implanting in such minds obscene, lewd, or lascivious thoughts or desires."

It is contended that the instructions thus given were erroneous. It is said that the language of these instructions is based upon the case of Regina v. Hicklin, L.R. 3 Q.B. 360, (1868), and that the rule of that case has been discredited by a line of decisions in the courts of appeals of the Second Circuit and the District of Columbia.[2]

The instruction given by the court follows the language which this court has previously used. Magon v. United States, supra, 248 F. at page 203, Duncan v. United States, 9 Cir., 48 F.2d 128, 132. The language of the instruction was substantially the same as that approved by the Supreme Court in Rosen v. United States, 161 U.S. 29, 43[3], 16 S.Ct. 434, 439, 40 L.Ed. 606.

We find it unnecessary to consider or determine whether the decisions of the Second Circuit and the District of Columbia previously referred to establish any different or better rule than that which this court has previously announced, for an examination of the decisions referred to discloses that they dealt with facts not comparable to those involved in this case. In general they dealt with cases in which undue emphasis was placed upon the importance of isolated passages, or upon special classes of persons who might be more susceptible to influence by the publication than members of the public generally.

In this case the trial court did not fall into any of the errors commented upon in the cases to which reference has been made. It did not point to a particular class of persons especially susceptible to immoral influences; rather the instruction referred to the "common sense of decency and modesty *of the community*." (Emphasis supplied.) The instruction later given referred to "that form of indecency which is calculated to promote *the general corrup-*

2. United States v. Dennett, 2 Cir., 39 F.2d 564, 76 A.L.R. 1092; United States v. One Book Entitled Ulysses, 2d Cir., 72 F. 2d 705; United States v. Levine, 2 Cir., 83 F.2d 156; Parmelee v. United States, 72 App.D.C. 203, 113 F.2d 729; Walker v. Popenoe, 80 U.S.App.D.C. 129, 149 F.2d 511.

3. "But it is proper to add that it was competent for the court below, in its discretion, and even if it had been inclined to regard the paper as obscene, lewd, and lascivious, to submit to the jury the general question of the nature of the paper, accompanied by instructions indicating the principles or rules by which they should be guided in determining what was an obscene, lewd, or lascivious paper within the contemplation of the statute under which the indictment was framed. That was what the court did when it charged the jury that 'the test of obscenity is whether the tendency of the matter is to deprave and corrupt the morals of those whose minds are open to such influence and into whose hands a publication of this sort may fall.' 'Would it,' the court said, 'suggest or convey lewd thoughts and lascivious thoughts to the young and inexperienced?' In view of the character of the paper, as an inspection of it will instantly disclose, the test prescribed for the jury was quite as liberal as the defendant had any right to demand."

*tion of morals."* (Emphasis supplied.) Nor did the instruction permit the jury to judge the book by detached portions, or otherwise than as a whole.

It is to be noted that Burstein himself endeavored to place his publication within that category referred to in *Parmelee v. United States*, 72 App.D.C. 203, 113 F.2d 729, 736, as a class of cases "in which publication and distribution were 'wholly for the purpose of profitably pandering to the lewd and lascivious'". He could hardly say that he did not do his best to put out a book designed to appeal to the lewd and the lascivious.

Although no objections were stated or noted when the charge was given, we have considered carefully the contentions made by appellant. We are of the opinion that there was no error in the instructions.

Appellant contends that he was denied the assistance of counsel. The record shows that when Burstein was first called for arraignment and plea he expressly requested the court's permission to handle his own case and without an attorney to represent him. It was ascertained that he was without funds with which to employ an attorney; he was told that the court would appoint an attorney to represent him without cost to him, but he again stated that he did not want an attorney so appointed. Notwithstanding his protestation, the court appointed an attorney for him. Thereafter a continuance of the case was obtained so that the attorney might prepare to defend him. On April 28, 1948 Burstein pleaded not guilty to the charge and his case was set for trial on May 18, following. On April 30, the appointed attorney appeared with Burstein and requested permission to withdraw from the case. It was stated by the attorney then and later that Burstein and he could not agree on how the defense should be conducted. Later Burstein made a statement suggesting that the disagreement arose out of the opinion of the attorney that Burstein should plead guilty. The statement of the appointed attorney was to the effect that there was an irreconcilable difference between them as to "how the defense should be conducted", and that the attorney felt that it would be to the disadvantage of Burstein if the attorney sat at the counsel table appearing to represent him in the sight of the jury and really taking no part in the defense. Burstein continued to assert his desire to act for himself without counsel. He was told by the court "whatever you want to do, the court will abide by it". The judge called attention to the fact that if Burstein desired counsel the court "would offer him the opportunity of some other attorney to serve upon appointment of the court. But, as you say now, he feels he could best defend himself in the case, without an attorney, that is his right. You cannot force an attorney on a defendant if he does not want him."

At the trial Burstein conducted his own defense. The court had the right to assume that the defense was proceeding along the lines which had produced the difference of opinion between Burstein and the attorney who had been appointed to represent him. What Burstein then undertook to offer in his own defense were three matters: (1) the government's delay in bringing him to trial; (2) that an attorney by the name of Erwin had told him that his case would undoubtedly be dismissed upon preliminary hearing; and (3) the history of his prior convictions of offences under this and other criminal statutes, apparently for the purpose of disclosing a series of persecutions by public authorities.

Upon appeal to this court, Burstein, still representing himself, first filed a brief urging the delay in bringing him to trial as ground for reversal, and also his contention that he was denied representation by counsel. Thereupon we appointed counsel to represent him in this court, and new briefs were filed on his behalf, omitting mention of the asserted error through delay in bringing appellant to trial, and apparently that point was abandoned. The other errors assigned here have been urged by the counsel so appointed with great vigor and ability.

With respect to the appointment of counsel, it is asserted that Burstein did not have the effective representation to which he was entitled because the attorney appointed to represent him in the first place had in-

sisted upon his pleading guilty. It is also contended that when Burstein proceeded to introduce evidence of his own prior convictions of various offenses the court should have intervened and prevented him from so doing, or at that time have insisted upon his having trained counsel to represent him.

We do not think that the record requires us to find that the attorney whom the court appointed for Burstein, notwithstanding Burstein's demand that he be permitted to handle his own case, insisted that Burstein should plead guilty. The court below made every possible effort to ascertain what Burstein desired to have done and in the course of the inquiry ascertained from the attorney that some difference of opinion had arisen as to how the defense should be handled. We do not think that the trial court was obliged to accept Burstein's suggestion that the attorney wanted him to plead guilty. We believe that the record tends to support the view, which the trial judge no doubt had, that Burstein insisted upon presenting the very matters which he did present or attempted to present when he handled his own defense; and that the difference of opinion which developed between himself and his attorney related to those matters.[4]

Furthermore, the court plainly indicated to Burstein that the court was prepared to appoint a different attorney if Burstein so desired. The appellant continued to urge his own wish that he handle the case in his own way. In doing so he first undertook to show the circumstances relating to his efforts to have his case brought on for trial. In explaining this aspect of his claimed defense he disclosed that on a previous occasion he had mailed in New York the same publication; that he had been arrested by federal authorities there, indicted under the same statute, and pleaded guilty to that charge, and sentence was imposed upon him. He was then at large under bond, and before he was com-

mitted, he had fled to California. There he made up the circulars and started to sell the same book and was immediately picked up by the Post Office inspectors and the indictment upon which he was here tried followed. He was released on bond and again jumped bond and returned to New York. While in New York he fell into the hands of State officers and the fingerprints then taken led to his identification, and he was then committed to the federal penitentiary at Atlanta, Georgia. It was while he was at Atlanta that he claims that he should have been returned earlier to California for trial on the present charge. As the appellant went on with his supposed defense he testified as to a number of other felony convictions. It is contended that he should have been prevented by the court from making these disclosures.

We find no reversible error in the fact that the appellant was permitted to show the circumstances surrounding his efforts to speed his trial in California while he was incarcerated because of conviction of a similar offense in a federal penitentiary in Georgia. No doubt the court hesitated to cut him short having in mind the right to be heard might well include the right to be heard upon a proposition manifestly untenable and even absurd. There was no way for the trial judge to ascertain in advance at what objective appellant was driving when he proceeded to develop the fact of his prior convictions. There was no way to tell whether he was attempting to elaborate upon the situation at Atlanta or attempting to develop for the jury a record of hard luck which might lead them to be more lenient with him.

We think that the appellant competently, intelligently and with full understanding of the implications waived his constitutional right to counsel. The record shows that the court went to every reasonable length in an effort to persuade the appellant to accept the services of counsel. "The Constitution does not force a lawyer

---

4. It has been held that one charged with crime is not deprived of his constitutional right to the effective assistance of counsel merely because counsel assigned to him by the court after an investigation of the facts advised a plea of guilty. Crum v. Hunter, 10 Cir., 151 F.2d 359, certiorari denied 328 U.S. 850, 66 S.Ct. 1117, 90 L. Ed. 1123. Cf. Shepard v. Hunter, 10 Cir., 163 F.2d 872.

upon a defendant", Adams v. U. S. ex rel. McCann, 317 U.S. 269, 63 S.Ct. 336, 242, 87 L.Ed. 268, 143 A.L.R. 435. The requirement that an accused have a fair trial, which is what we are concerned with here,[5] does not prohibit him from choosing to act for himself. The testimony he gave, and the manner in which he handled himself, show that although his ideas of a defense were extraordinarily unorthodox, he was alert and intelligent. Once he had decided to become a witness, and had testified, the prosecutor could have questioned him about these convictions. He could not have been in a substantially worse position merely because he anticipated and forestalled such a cross-examination, whatever may have been the ideas which prompted him to take such action.

When appellant chose to proceed without counsel, he chose a course of action fraught with the danger that he would commit legal blunders. But having made that choice he did not thereby acquire the right to have the court act as his counsel whenever he seemed to be blundering. It cannot be said that the court denied him representation of counsel, or denied him a fair trial, because the judge refrained from intermeddling.

One further contention hardly needs notice. The copy of the book which was introduced as an exhibit had had some of its more obscene passages underscored with red pencil lines. Appellant claims this prejudiced him, for the book when prepared by him was not so marked. The court charged the jury that the red lines were no part of the book, and that they should disregard them. We find no reversible error here.

The outstanding feature of this record is that it discloses what ought to be regarded as important,—an abundance of evidence which clearly warranted the jury in a determination of guilt. It was dis-

closed without contradiction that the appellant decided that he needed money and that he deliberately couched his circular letters advertising his book for its lewd and lascivious features. We find that none of appellant's rights were denied him; that he had a fair trial; that there was no error in the proceedings of the court; that there was abundant evidence of his guilt, and that the judgment should be affirmed.

---

5. We do not overlook the fact that since the point is here urged upon appeal, and not in a collateral attack on the judgment, as was the situation in most of the cases dealing with the right to counsel, appellant is not limited to errors so fundamental as to deny his constitutional rights. The question of his claimed denial of representation by counsel is by us considered as a part of the general question whether he had a fair trial.