**BESIG v. UNITED STATES.**

No. 13227.

United States Court of Appeals
Ninth Circuit.

Oct. 23, 1953.

---

3. The accident occurred July 28, 1950, and the trial was had in March 1952.

George Olshausen, San Francisco, Cal., for appellant.

Lloyd H. Burke, U. S. Atty., Charles Elmer Collett, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before STEPHENS, ORR and POPE, Circuit Judges.

STEPHENS, Circuit Judge.

Two books entitled respectively "Tropic of Cancer" and "Tropic of Capricorn", which were written by Henry Miller and were printed in Paris, were intercepted at an American port of entry and libeled

under Section 1305(a) of Title 19 U.S.C.A.[1] as obscene. The district court found them to be obscene and ordered them destroyed. Besig, the owner of the books, is here appealing upon the ground that neither of the two books, which are commonly referred to together as "The Tropics", is obscene.

[■] Since all of the evidence is in writing, we review and weigh the evidence, though with due regard to the conclusions of the trial court.[2]

We note in the margin[3] the Funk & Wagnalls New Standard Dictionary and Webster's New International Dictionary definitions of the word "obscene".

1. Title 19 U.S.C.A. § 1305(a): "All persons are prohibited from importing into the United States from any foreign country any book, pamphlet, paper, writing, advertisement, circular, print, picture, or drawing containing any matter advocating or urging treason or insurrection against the United States, or forcible resistance to any law of the United States, or containing any threat to take the life of or inflict bodily harm upon any person in the United States, or any obscene book, pamphlet, paper, writing, advertisement, circular, print, picture, drawing, or other representation, figure, or image on or of paper or other material, or any cast, instrument, or other article which is obscene or immoral, or any drug or medicine or any article whatever for the prevention of conception or for causing unlawful abortion, or any lottery ticket, or any printed paper that may be used as a lottery ticket, or any advertisement of any lottery. No such articles, whether imported separately or contained in packages with other goods entitled to entry, shall be admitted to entry; and all such articles and, unless it appears to the satisfaction of the collector that the obscene or other prohibited articles contained in the package were inclosed therein without the knowledge or consent of the importer, owner, agent, or consignee, the entire contents of the package in which such articles are contained, shall be subject to seizure and forfeiture as hereinafter provided: Provided, That the drugs hereinbefore mentioned, when imported in bulk and not put up for any of the purposes hereinbefore specified, are excepted from the operation of this subdivision: Provided further, That the Secretary of the Treasury may, in his discretion, admit the so-called classics or books of recognized and established literary or scientific merit, but may, in his discretion, admit such classics or books only when imported for noncommercial purposes.

"Upon the appearance of any such book or matter at any customs office, the same shall be seized and held by the collector to await the judgment of the district court as hereinafter provided; and no protest shall be taken to the United States Customs Court from the decision of the collector. Upon the seizure of such book or matter the collector shall transmit information thereof to the district attorney of the district in which is situated the office at which such seizure has taken place, who shall institute proceedings in the district court for the forfeiture, confiscation, and destruction of the book or matter seized. Upon the adjudication that such book or matter thus seized is of the character the entry of which is by this section prohibited, it shall be ordered destroyed and shall be destroyed. Upon adjudication that such book or matter thus seized is not of the character the entry of which is by this section prohibited, it shall not be excluded from entry under the provisions of this section.

"In any such proceeding any party in interest may upon demand have the facts at issue determined by a jury and any party may have an appeal or the right of review as in the case of ordinary actions or suits." Title 19 U.S.C.A. § 1305 (a).

2. See Orvis v. Higgins, 2 Cir., 1950, 180 F.2d 537, 539; Equitable Life Assurance Soc. v. Irelan, 9 Cir., 1941, 123 F.2d 462, 464; Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.

3. Funk & Wagnalls New Standard Dictionary defines the word "obscene" as follows: "1. Offensive to chastity, delicacy, or decency; expressing or presenting to the mind or view something that decency, delicacy and purity forbid to be exposed; offensive to morals; indecent; impure. 2. [Poet.] Offensive to the senses; foul; disgusting. 3. Of evil omen."

Webster's New International Dictionary, 2nd ed. unabridged, 1940: "1. Offensive to taste; foul; loathsome; disgusting; 2.a. Offensive to chastity of mind or to modesty; expressing or presenting to the mind or view something that delicacy, purity, and decency forbid to be exposed; lewd; indecent; as obscene language, dances, images. b. Characterized by or given to obscenity; as, an obscene mind or person. 3. Inauspicious; ill-omened;—a Latinism. Obs."

The word "obscene" is not uncommon and is used in English and American speech and writings as the word symbol for indecent, smutty, lewd or salacious reference to parts of the human or animal body or to their functions or to the excrement therefrom. Each of The Tropics is written in the composite style of a novel-autobiography, and the author as a character in the book carries the reader as though he himself is living in disgrace, degradation, poverty, mean crime, and prostitution of mind and body. The vehicle of description is the unprintable word of the debased and morally bankrupt. Practically everything that the world loosely regards as sin is detailed in the vivid, lurid, salacious language of smut, prostitution, and dirt. And all of it is related without the slightest expressed idea of its abandon. Consistent with the general tenor of the books, even human excrement is dwelt upon in the dirtiest words available. The author conducts the reader through sex orgies and perversions of the sex organs, and always in the debased language of the bawdy house. Nothing has the grace of purity or goodness. These words of the language of smut, and the disgraceful scenes, are so heavily larded throughout the books that those portions which are deemed to be of literary merit do not lift the reader's mind clear of their sticky slime. And it is safe to say that the "literary merit" of the books carries the reader deeper into it. For this reason, The Tropics are far more dangerous than "Confessions of a Prostitute" which was the subject of our opinion in Burstein v. United States, 9 Cir., 1949, 178 F.2d 665. There, the scenes depicted are obscene because of the scene itself which in its stark ugliness might well repel many. The Tropics lure on with the cleverness of scene, skilfulness of recital, and the use of worse than gutter words. All of this is sought to be justified through the sophistry, as the trial judge, Honorable Louis E. Goodman, put it, of "confession and avoidance".[4] It is claimed that they truthfully describe a base status of society in the language of its own iniquities. And that, since we live in an age of realism, obscene language depicting obscenity in action ceases to be obscenity.

Whether the moral conventions should be flaunted in the cause of frankness, art, or realism, we have no occasion to decide. That question is for the policy branches of the government. Nor do we understand that we have the legal power to hold that the statute authorizing the seizure of obscene books is inapplicable to books in which obscenity is an integral part of a literary work. So that obscenity, though a part of a composition of high literary merit, is not excepted from operation of the statute, whether written in the style of the realists, surrealists, or plain shock writers. The civilization of our times holds to the premise that dirt in stark nakedness is not generally and at all times acceptable. And the great mass of the people still believe there is such a thing as decency. Indecency is easily recognizable. Such is the premise of the statute. The Congress has chosen to enact a censorship which would not have been possible except for the self-styled prophets of truth who offend so grievously.

It is of course true that the ears of some may be so accustomed to words which are ordinarily regarded as obscene that they take no offense at them, but the law is not tempered to the hardened minority of society. The statute forbidding the importation of obscene books is not designed to fit the normal concept of morality of society's dregs, nor of the different concepts of morality throughout the world, nor for all time past and future, but is designed to fit the normal American concept in the age in which we live. It is no legitimate argument that because there are social groups composed of moral delinquents in this or in other countries, that their language shall

4. United States v. Two Obscene Books, D. C.1951, 99 F.Supp. 760, 762. Also see

United States v. Two Obscene Books, D. C.1950, 92 F.Supp. 934.

be received as legal tender along with the speech of the great masses who trade ideas and information in the honest money of decency.

Adequate provision is made in the statute in the interests of classics and the technical, by the following proviso:

> "*Provided further,* That the Secretary of the Treasury may, in his discretion, admit the so-called classics or books of recognized and established literary or scientific merit, but may, in his discretion, admit such classics or books only when imported for noncommercial purposes." Title 19 U.S.C.A. § 1305 (a).

No action under this proviso has been taken by the Secretary of the Treasury, nor has appellant requested any action under or pursuant to it.

It is claimed that these books (The Tropics) are not for the immature of mind, and that adults read them for their literary and informative merits, but, whether true or untrue, we cannot measure their importability by such a yardstick. The Congress probably saw the impracticability of preventing the use of the books by the young and the pure. And of course they knew that salacious print in the hands of adults, even in the hands of those whose sun is near the western horizon, may well incite to disgusting practices and to hideous crime.

We agree that the book as a book must be obscene to justify its libel and destruction, but neither the number of the "objectionable" passages nor the proportion they bear to the whole book are controlling. If an incident, integrated with the theme or story of a book, is word-painted in such lurid and smutty or pornographic language that dirt appears as the primary purpose rather than the relation of a fact or adequate description of the incident, the book itself is obscene. We are not well acquainted with Aristophanes or his times, but we know they were different from ours. We have chanced upon Chaucer and we know his times were different from ours. Boccaccio is lurid. The Bible is not free from the recounting of immoral practices. But the translators, from the languages in which The Bible was originally written, did not word-paint such practices in the lurid-Miller-morally-corrupt manner. Dirty word description of the sweet and sublime, especially of the mystery of sex and procreation, is the ultimate of obscenity. We have referred to Aristophanes, Chaucer, Boccaccio, and The Bible only because those works were taken as examples by the author of the opinion in the case of United States v. One Book Entitled Ulysses, 2 Cir., 1934, 72 F.2d 705, 707, a case cited by appellant to illustrate his point that " 'No work may be judged from a selection of such paragraphs alone. * * * ' " Appellant also cites United States v. Levine, 2 Cir., 1936, 83 F.2d 156, 157. Whether those cases were rightly decided we do not say, but the point is not relevant because we have adjudged each book as an integrated whole.

Appellant argues that the test we used in Burstein v. United States, 9 Cir., 1949, 178 F.2d 665, 667, as to what is obscene, is unworkable because it approves the rule that language is obscene when it may be termed "dirt for dirt's sake". He finds the opinion "self-contradictory" when we say that obscene matter "is offensive to the common sense of decency and modesty of the community," and later in the opinion say "[t]he true test to determine whether a writing is * * obscene * * * is whether its language has a tendency to deprave or corrupt the morals of those whose minds are open to such influences and into whose hands it may fall by allowing or implanting in such minds obscene, lewd, or lascivious thoughts or desires." Appellant thinks our opinion is "unclear as to whether the test of obscenity is that it *repels* or that it *seduces.*"

We observe no contradiction in any of these expressions. They aptly describe the quality of language which the word "obscene" is meant to suggest. Of course, language can be so nasty as to

repel and of course to seduce as well. Appellant's argument tempts us to quote Pope's[5] quatrain about the Monster Vice which, when too prevalent, is embraced.

Appellant thinks the district court committed error in deciding contrary to the great weight of opinion evidence as to the quality of Mr. Miller's writings. The point has no merit. Opinion evidence is useful, but not controlling.[6] We have carefully read and analyzed the voluminous affidavits and exhibits contained in the record. To a large extent they are opinions of authors who resent any limitation on their writings. Their opinions are relevant and competent evidence, but their views are advisory only as to the norm of the meaning of the word "obscene". We share the general antipathy to censorship and we are aware that individual tastes and special occasions and different times and different peoples differ as to what is offensive language. Yet we risk the assertion that there is an underlying, perhaps universal, accord that there is a phase of respectable delicacy related to sex, and that those compositions which purposefully flaunt such delicacy in language generally regarded as indecent come under the ban of the statute.

We think Judge Learned Hand was in the best of his famous form in his happy use of words in United States v. Kennerley, D.C.S.D.N.Y.1913, 209 F. 119, 121: "If there be no abstract definition, such as I have suggested, should not the word 'obscene' be allowed to indicate the present critical point in the compromise between candor and shame at which the community may have arrived here and now? If letters must, like other kinds of conduct, be subject to the social sense of what is right, it would seem that a jury should in each case establish the standard much as they do in cases of negligence. To put thought in leash to the average conscience of the time is perhaps tolerable, but to fetter it by the necessities of the lowest and least capable seems a fatal policy. Nor is it an objection, I think, that such an interpretation gives to the words of the statute a varying meaning from time to time. Such words as these do not embalm the precise morals of an age or place; while they presuppose that some things will always be shocking to the public taste, the vague subject-matter is left to the gradual development of general notions about what is decent. * * "

The point that the Constitutional guarantee of freedom of speech or of the printing press, (or, we may add, of the radio and television,) is violated, is without merit. The point is made and the only argument to sustain it is simply that the books, since they have some literary merit, are not obscene. We have decided otherwise.

The judgment is affirmed.

---

5. Alexander Pope (1688–1744), English poet, from his poem entitled "Essay on Man":

    "Vice is a Monster of so frightful mien
     As to be hated needs but to be seen.
    Yet seen too oft, familiar with her face,
     We first endure, then pity, then embrace."

6. Sartor v. Arkansas Natural Gas Corp., 1944, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967; United States v. Honolulu Plantation Co., 9 Cir., 1950, 182 F. 2d 172, 178.