UNITED STATES of America,
Libellant,

v.

31 PHOTOGRAPHS 4¾″ x 7″ in size, and various pictures, books and other articles.

Institute for Sex Research, Inc. at Indiana University, Claimant.

United States District Court
S. D. New York.
Oct. 31, 1957.

Paul W. Williams, U. S. Atty. for Southern District of New York, New York City, Benjamin T. Richards, Jr., Asst. U. S. Atty., New York City, of counsel, for libellant.

Greenbaum, Wolff & Ernst, New York City, Morris L. Ernst, Harriet F. Pilpel, Nancy F. Wechsler, Barry H. Singer, and Morton David Goldberg, New York City, of counsel, for claimant.

Daniel James, New York City, and Hubert Hickam and Jerry P. Belknap, Indianapolis, Ind., Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., of counsel, for Trustees of Indiana University, amicus curiae, in support of claimant's motion for summary judgment.

PALMIERI, District Judge.

The United States Attorney has filed a libel under the provisions of § 305 (a) of the Tariff Act of 1930,[1] seeking the forfeiture, confiscation, and destruction of certain photographs, books, and other articles which the claimant, Institute for Sex Research, Inc., at Indiana University, seeks to import into the United States. The libel is based upon the allegation that the libelled material

1. 46 Stat. 688 (1930), 19 U.S.C.A. § 1305 (a). This section provides, in pertinent part, as follows: "All persons are prohibited from importing into the United States from any foreign country * * * any obscene book, pamphlet, paper, writing, advertisement, circular, print, picture, drawing, or other representation, figure, or image on or of paper or other material, or any cast, instrument, or other article which is obscene or immoral * * *. No such articles * * * shall be admitted to entry; and all such articles * * * shall be subject to seizure and forfeiture as hereinafter provided * * *." The section further provides for the admission of certain classics or books in the discretion of the Secretary of the Treasury. See note 9, infra. The Secretary has refused to exercise his discretion to admit in this case. See note 10, infra.

is "obscene and immoral"[2] within the meaning of § 305(a). The claimant seeks the release of the material to it, maintaining that the attempted importation is not in violation of § 305(a) and that, if § 305(a) is interpreted so as to prohibit the importation of the libelled material, the section violates the provisions of certain articles of the Constitution of the United States. Since I believe that § 305(a) does not permit the exclusion of the material, I do not reach the latter contention. Thus, the question of "academic freedom," much bruited in the oral argument by claimant, does not arise in this case.

■■ Both the Government and the claimant have moved for summary judgment. The Government's motion is supported by the photographs, books, and articles themselves. For the purposes of this decision, I assume that the libelled material is of such a nature that, "to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest."[3] The claimant's motion is supported by affidavits sworn to by the President of the Institute, the Institute's Director of Field Research, the President of Indiana University, and various physicians, psychologists, psychiatrists, penologists, and academicians. Among these is an affi-

davit sworn to by the Hon. James V. Bennett, Director of the Bureau of Prisons, United States Department of Justice. Mr. Bennett states in his affidavit that the Institute has made substantial contributions to the study of problems of sexual adjustment encountered among prison inmates. He also states that understanding of pathological sexuality and sexual offenders has been enhanced by the study of the erotic productions of these deviated persons. An affidavit has also been filed by claimant's attorney, setting forth certain prior proceedings in this matter. Finally, the Trustees of Indiana University have submitted a brief, *amicus curiæ*, in support of claimant's position. The President of the University, in his affidavit, has described the Institute as "[i]n essence * * * for all practical purposes * * * a special research department of the University." The Government has neither served affidavits setting forth any facts in opposition to those contained in the affidavits served by the claimant,[4] nor has it served an affidavit from which it would appear that it cannot "present by affidavit facts essential to justify [its] opposition."[5]

■ There is, therefore, no genuine issue as to the following facts, which are the only ones I find relevant to a decision of the issues before me:

2. My discussion is framed in terms of whether the libelled material is "obscene." I do not believe that the word "immoral" adds to the class of material excluded from importation by the word "obscene," and the Government has not contended that it does. See 71 Cong.Rec. 4457 (1929). Cf. Commercial Pictures Corp. v. Regents of University of State of New York 1954, 346 U.S. 587, 74 S. Ct. 286, 98 L.Ed. 329.

3. Roth v. United States, 1957, 354 U.S. 476, 489, 77 S.Ct. 1304, 1311, 1 L.Ed.2d 1498.

4. Fed.R.Civ.P. 56(c), 28 U.S.C.A.

5. Fed.R.Civ.P. 56(f). The Government's position on oral argument and subsequently has been that while it does not wish to submit affidavits, it does not concede the truth of the facts set forth

in claimant's affidavits. Of course, a motion for summary judgment cannot be defeated by a simple declaration that the opponent does not concede the facts which are clearly established by the movant's affidavits. "But where the moving party properly shoulders his burden, the opposing party must either come forward with some proof that raises a genuine factual issue or, in accordance with Rule 56(f), show reasons satisfactory to the court why it is presently not forthcoming." 6 Moore's Federal Practice, par. 56.15[5] (2d Ed. 1953). Cf. Engl v. Aetna Life Ins. Co., 2 Cir., 1943, 139 F.2d 469.

I am aware, of course, of my discretion to refuse summary judgment even though the Government has stood mute, see 6 Moore's Federal Practice, par. 56.-15[6] (2d Ed.1953) ; but I see no reason to do so in this case.

1.  That the claimant seeks to import the libelled material "for the sole purpose of furthering its study of human sexual behavior as manifested in varying forms of expression and activity and in different national cultures and historical periods."[6]

2.  That the libelled material will not be available to members of the general public, but "will be held under security conditions * * * for the sole use of the Institute staff members or of qualified scholars engaged in bona fide research * * *"[7]

and

3.  That, as to those who will have access to the material sought to be imported, there is no reasonable probability that it will appeal to their prurient interest.[8]

*In limine,* it is well to set forth the posture of this case as I have it before me for decision. Claimant applied, in 1952, to the Secretary of the Treasury for permission to import the material under the second proviso of § 305(a).[9] The Secretary declined to exercise his discretion for this purpose. In a letter advising claimant's attorneys of this decision, the Acting Secretary of the Treasury stated that a limited exception to the prohibition of § 305(a) had been

established by certain cases, but that the exception was "limited to a narrow category of articles and * * * applicable to only a specialized practice of medicine." The Acting Secretary stated that he did not feel that administrative extension of this exception would be justified and that the Department of Justice would be requested to bring forfeiture proceedings "in order to resolve the pertinent questions of law and furnish judicial guidance for our future actions."[10] The claimant has not, however, sought review of the Secretary's action, and my decision on the Government's libel implies nothing as to the correctness of his action.

The question which is before me for decision, therefore, is whether § 305(a) of the Tariff Act of 1930, in prohibiting the importation of "obscene" material prohibits the importation of material which may be assumed to appeal to the prurient interest of the "average person," if the only persons who will have access to the material will study it for the purposes of scientific research, and if, as to those who alone will have access to the material, there is no reasonable probability that it will appeal to their prurient interest. In short, the question presented for decision is the meaning of the word "obscene" in § 305(a) of the Tariff Act of 1930.[11]

6.  Affidavit of Paul H. Gebhard, President of the Institute, page 10.

7.  Id. at page 13.

8.  Affidavit of Walter C. Alvarez, M.D., page 5. See, also, the affidavit of Karl M. Bowman, M.D., page 7.

9.  Affidavit of Harriet F. Pilpel, member of the firm which is acting as claimant's attorney, page 3. The proviso reads: *"Provided further,* That the Secretary of the Treasury may, in his discretion, admit the so-called classics or books of recognized and established literary or scientific merit, but may, in his discretion, admit such classics or books only when imported for noncommercial purposes." 46 Stat. 688 (1930), 19 U.S.C.A. § 1305 (a). I discuss the contention that this provision exhausts the possibilities of allowing the importation of the libelled material infra at page 359 of 156 F.Supp.

10. Pilpel affidavit, supra note 9, page 4, and Exhibit A. It appears, from the reference of the Secretary to United States v. One Package, 2 Cir., 1936, 86 F.2d 737, that the articles to which the Secretary referred were contraceptives. But the second proviso of § 305(a) allows the Secretary to "admit the so-called classics or books of recognized and established literary or scientific merit." See note 9, supra.

11. In arriving at my conclusion on this aspect of the case I have relied upon a number of cases arising under what is now 18 U.S.C. § 1461 (Supp. IV) prohibiting use of the mails for the transportation of, *inter alia,* obscene matter. The provisions now found in 19 U.S.C.A. § 1305(a) and 18 U.S.C. § 1461 (Supp. IV) "were part of a continuous scheme to suppress immoral articles and obscene literature and should so far as possible

■ Material is obscene if it makes a certain appeal to the viewer. It is not sufficient that the material be "merely coarse, vulgar, or indecent in the popular sense of those terms." United States v. Males, D.C.D.Ind.1892, 51 F. 41, 43.[12] Its appeal must be to "prurient interest." "Obscene material is material which deals with sex in a manner appealing to prurient interest." Roth v. United States, 1957, 354 U.S. 476, 487, 77 S.Ct. 1304, 1310, 1 L.Ed.2d 1498 (footnote omitted).

But the search for a definition does not end there.[13] To whose prurient interest must the work appeal? While the rule is often stated in terms of the appeal of the material to the "average person," Roth v. United States, 1957, 354 U.S. 476, 489, 77 S.Ct. 1304, 1 L.Ed.2d 1498,[14] it must be borne in mind that the cases applying the standard in this manner do so in regard to material which is to be distributed to the public at large. I believe, however, that the more inclusive statement of the definition is that which judges the material by its appeal to "all those whom it is likely to reach." United States v. Levine, 2 Cir., 1936, 83 F.2d 156, 157.[15] Viewed in this light, the

be construed together and consistently." United States v. One Package, 2 Cir., 1936, 86 F.2d 737, 739. The Government urges, however, that the audience to which the material is directed is relevant in a criminal prosecution under 18 U.S.C. § 1461 (Supp. IV) since it bears on the question of criminal intent, but not in a libel under 19 U.S.C.A. § 1305 (a) since intent is not there a factor. To the extent, if any, that the One Package decision does not answer this contention, it is answered by the requirement of Roth that obscenity statutes be construed as narrowly as is possible to effectuate their purpose without impinging on other interests. "The fundamental freedoms of speech and press have contributed greatly to the development and well-being of our free society and are indispensable to its continued growth. Ceaseless vigilance is the watchword to prevent their erosion by Congress or by the States. The door barring federal and state intrusion into this area cannot be left ajar; it must be kept tightly closed and opened only the slightest crack necessary to prevent encroachment upon more important interests." Roth v. United States, 1957, 354 U.S. 476, 488, 77 S.Ct. 1304, 1311, 1 L.Ed. 2d 1498 (footnotes omitted). And see footnote 40, infra, and text at footnote 26, infra.

12. See also Swearingen v. United States, 1896, 161 U.S. 446, 450–451, 16 S.Ct. 562, 40 L.Ed. 765; Duncan v. United States, 9 Cir., 48 F.2d 128, certiorari denied 1931, 283 U.S. 863, 51 S.Ct. 656, 75 L. Ed. 1468; United States v. Wroblenski, D.C.E.D.Wis.1902, 118 F. 495; cf. United States v. Limehouse, 1932, 285 U.S. 424, 52 S.Ct. 412, 76 L.Ed. 843.

13. See Judge Frank's discussion of the appropriateness of judicial definitions of obscenity, prior to the Supreme Court's decision in the Roth case. United States v. Roth, 2 Cir., 1956, 237 F.2d 796, 801 et seq. (concurring opinion), affirmed 1957, 354 U.S. 476, 77 S.Ct. 1304, 1 L. Ed.2d 1498.

14. See also United States v. One Book Entitled Ulysses, etc., 2 Cir., 1934, 72 F. 2d 705, 708; Walker v. Popenoe, 1945, 80 U.S.App.D.C. 129, 149 F.2d 511, 512 ("ordinary reader"). I understand the statement in Ulysses that permission to import does not depend upon "the character of those to whom [the materials] are sold," 2 Cir., 1934, 72 F.2d 705, 708, to mean that in a case of material distributed to the general public, the claimant may not show that there are some members of the public as to whom the material will not have a prurient appeal.

15. The Chief Justice, concurring in Roth, said that "Present [obscenity] laws depend largely upon the effect that the materials may have upon those who receive them. It is manifest that the same object may have a different impact, varying according to the part of the community it reached." Roth v. United States, 1957, 354 U.S. 476, 495, 77 S.Ct. 1304, 1314, 1 L.Ed.2d 1498. And the charge of the trial judge in Roth, approved by the Court, stated the test in terms of "all those whom [the material] is likely to reach." Id. 354 U.S. at page 490, 77 S.Ct. at page 1312. And see United States v. Dennett, 2 Cir., 1930, 39 F.2d 564, 568, 76 A.L.R. 1092 ("those into whose hands the publication might fall"); One, Inc., v. Olesen, 9 Cir., 1957, 241 F. 2d 772, 775, petition for certiorari filed, 26 U.S.L.Week 3046 (U.S., July 18, 1957, 78 S.Ct. 364) ("effect * * * upon the reader"); Parmelee v. United States, 1940, 72 App.D.C. 203, 113 F.2d 729, 731 ("all those whom it is likely to reach");

"average man" test is but a particular application of the rule, often found in the cases only because the cases often deal with material which is distributed to the public at large.

▉ Of course, this rule cuts both ways. Material distributed to the public at large may not be judged by its appeal to the most sophisticated,[16] nor by its appeal to the most susceptible.[17] And I believe that the cases establish that material whose use will be restricted to those in whose hands it will not have a prurient appeal is not to be judged by its appeal to the populace at large.

In Commonwealth v. Landis, Q.S.1870, 8 Phila., Pa., 453, defendant had been convicted of publishing an obscene libel.[18] The court approved a charge to the jury in which it was stated that the publication would be justified if "made for a legitimate and useful purpose, and * * * not made from any motive of mere gain or with a corrupt desire to debauch society." Q.S.1870, 8 Phila., Pa., 453, 454. While scientific and medical publications "in proper hands for useful purposes" may contain illustrations exhibiting the human form, the court held that such publications would be obscene libels "if wantonly exposed in the open markets, with a wanton and wicked desire to create a demand for them." Id. at pages 454–455. Finally, the court held that the human body might be exhibited before a medical class for purposes of instruction, "but that if the same human body were exposed in front of one of our medical colleges to the public indiscriminately, even for the purpose of operation, such an exhibition would be held to be indecent and obscene." Id. at page 455.[19]

In United States v. Chesman, C.C.E.D. Mo.1881, 19 F. 497, the court found offensive, matter which was taken from books upon medicine and surgery. The court held that such matter "would be proper enough for the general use of members and students of the profession." But, the court continued, "[t]here are many things contained in the standard works upon these subjects which, if printed in pamphlet form and spread broadcast among the community, being sent through the mail to persons of all classes, including boys and girls, would be highly indecent and obscene." C.C. E.D.Mo.1881, 19 F. 497–8.[20]

United States v. Two Obscene Books, D.C.N.D.Cal.1951, 99 F.Supp. 760, 762, affirmed sub nom. Besig v. United States, 9 Cir., 1953, 208 F.2d 142 ("those whose minds are open to such influences and into whose hands [the material] may fall * * *."); United States v. Goldstein, D.C.D.N.J.1947, 73 F.Supp. 875, 877 ("those into whose hands the publication might fall"); United States v. Males, D.C.D.Ind.1892, 51 F. 41, 43 ("those into whose hands it may fall"); United States v. Clarke, D.C.E.D.Mo.1889, 38 F. 500, 502 (same). Cf. United States v. 4200 Copies International Journal, etc., D.C.E.D.Wash. 1955, 134 F.Supp. 490, 494, affirmed sub. nom. Mounce v. United States, 9 Cir., 1957, 247 F.2d 148, petition for certiorari granted 78 S.Ct. 267.

16. See the charge to the jury quoted in Roth v. United States, 1957, 354 U.S. 476, 490, 77 S.Ct. 1304, 1 L.Ed.2d 1498.

17. Butler v. State of Michigan, 1957, 352 U.S. 380, 77 S.Ct. 524, 1 L.Ed.2d 412; Volanski v. United States, 6 Cir., 1957, 246 F.2d 842.

18. The book was entitled "Secrets of Generation." Commonwealth v. Gordon, Phila.Q.S.1949, 66 Pa.Dist. & Co.R. 101, 121.

19. The history of the early ban upon the use of the human body for the purposes of anatomical study and the eventual removal of the restriction so long as the books and treatises exhibiting the human body were restricted to practitioners and students is recounted in Parmelee v. United States, 1940, 72 App.D.C. 203, 113 F.2d 729, 734–735.

20. I understand the statement in Chesman, D.C.E.D.Mo.1881, 19 F. 497, 498, that "[T]he law is violated, without regard to the character of the person to whom [the publications] are directed" to apply to cases of widespread distribution, such as was present in Chesman, and in the sense set forth in note 14, supra.

It is interesting to note that the court in Parmelee v. United States, 1940, 72 App.D.C. 203, 113 F.2d 729, said that "No reasonable person at the present time would suggest even that limitation [that texts containing representations

And in United States v. Clarke, D.C.E. D.Mo.1889, 38 F. 500, it is said that "[E]ven an obscene book, or one that, in view of its subject-matter, would ordinarily be classed as such, may be sent through the mail, or published, to certain persons, for certain purposes." D.C.E.D. Mo.1889, 38 F. 500, 502.[21]

In United States v. Smith, D.C.E.D. Wis.1891, 45 F. 476, the court stated that a determination of obscenity depended upon circumstance. "The public exposure of the person is most obscene, yet the necessary exhibition of the person to a physician is not only innocent, but is a proper act, dictated by positive duty. Instruction touching the organs of the body, under proper circumstances, is not reprehensible; but such instruction to a mixed assemblage of the youth of both sexes might be most demoralizing." D. C.E.D.Wis.1891, 45 F. 476, 478.

In upholding the exclusion from evidence of testimony tending to show that the book in issue was intended for doctors and married couples, the Court of Appeals for the Eighth Circuit has said: "The book itself was in evidence. It was not a communication from a doctor to his patient, nor a work designed for the use of medical practitioners only." Burton v. United States, 8 Cir., 1906, 142 F. 57, 63.

The Court of Appeals for this Circuit, in holding that proof of those to whom the pamphlet was sold is part of the Government's case, said: "In other words, a publication might be distributed among doctors or nurses or adults in cases where the distribution among small

children could not be justified. The fact that the latter might obtain it accidently or surreptitiously, as they might see some medical books which would not be desirable for them to read, would hardly be sufficient to bar a publication otherwise proper. * * * Even the court in Regina v. Hicklin, L.R. 3 Q.B. at p. 367 * * * said that 'the circumstances of the publication' may determine whether the statute has been violated." United States v. Dennett, 2 Cir., 1930, 39 F.2d 564, 568, 76 A.L.R. 1092.

Finally, a situation very similar to the one at bar was decided in United States v. One Unbound Volume, etc., D.C.D.Md. 1955, 128 F.Supp. 280. Claimant had attempted to import a collection of prints which depicted statues, vases, lamps, and other antique artifacts which were decorated with or displayed erotic activities, features, or symbols, and which portrayed acts of sodomy and other forms of perverted sexual practice. While finding that the study of erotica in ancient times was a recognized field of archeology, the court, after referring to the fact that the claimant was a microchemist and, at best, an amateur archeologist, significantly added: "I do not believe the present state of the taste and morals of the community would approve the public exhibition of a collection of objects similar to those shown on the prints, nor the public exhibition or sale of the prints themselves, although in my opinion most normal men and women in this country would approve the ownership of such a publication by a museum, library, college or other educational institution, where its use could be con-

of the human body be restricted to use among practitioners and students] upon the circulation and use of medical texts, treatises and journals. In many homes such books can be found today; in fact standard dictionaries, generally, contain anatomical illustrations. It is apparent, therefore, that civilization has advanced far enough, at last, to permit picturization of the human body for scientific and educational purposes." 1940, 72 App.D.C. 203, 113 F.2d 729, 735.

21. And see the charge to the jury in the same case, United States v. Clarke, D.C. E.D.Mo.1889, 38 F. 732.

"It is settled, at least so far as this court is concerned, that works of physiology, medicine, science, and sex instruction are not within the statute, though to some extent and among some persons they may tend to promote lustful thoughts." United States v. One Book Entitled Ulysses, etc., 2 Cir., 1934, 72 F. 2d 705, 707.

trolled." D.C.D.Md.1955, 128 F.Supp. 280, 282.[22]

The cases upholding importation of contraceptives and books dealing with contraception when sought to be brought into the country for purposes of scientific and medical research[23] are further indications that the statute is to be interpreted as excluding or permitting material depending on the conditions of its use.[24] It is true that these cases held, on analogy to what is now 18 U.S.C. § 1461 (Supp. IV) that only contraceptives intended for "unlawful" use were banned.[25] The circumstances of the use were thus held relevant. But "contraception" is a word describing a physical act, devoid of normative connotations until modified by an adjective such as "unlawful." "Obscene," on the other hand, describes that quality of an article which causes it to have a certain appeal to the interests of the beholder.

The intent of the importer, therefore, relevant to the contraceptive cases only because "unlawful" use alone was proscribed, is relevant in an obscenity case[26] because of the very nature of the determination (as to the appeal of the material to the viewer) which must be made before the article may be deemed "obscene."

The customs barrier which is sought to be imposed by this suit must be viewed in the light of the great variety of goods permitted to enter our ports. For instance, despite the legitimate concern of the community with the distribution and sale of narcotic drugs, their importation is not completely prevented.[27] It is carefully regulated so as to insure their confinement to appropriate channels.[28] Viruses, serums, and toxins are another example. Their potential harm would be incalculable if they were placed in unknowing or mischievous hands. But proposed importations of bacilli of dangerous and highly contagious diseases do not lead us to shut our ports in panic. Rather, we place our faith in the competence of those who are entrusted with their proper use.[29] So, here, while the material would not be importable for general circulation, its closely regulated use by an unimpugned institution of learning and research removes it from

22. See also Burstein v. United States, 9 Cir., 1949, 178 F.2d 665. Cf. Klaw v. Schaffer, D.C.S.D.N.Y.1957, 151 F.Supp. 534, 539, note 6, appeal pending.

23. United States v. One Package, 2 Cir., 1936, 86 F.2d 737; United States v. Nicholas, 2 Cir., 1938, 97 F.2d 510; Davis v. United States, 6 Cir., 1933, 62 F.2d 473; Consumers Union of United States, Inc., v. Walker, 1944, 79 U.S. App.D.C. 229, 145 F.2d 33; see also, Youngs Rubber Corp. v. C. I. Lee & Co., 2 Cir., 1930, 45 F.2d 103, 108; cf. Bours v. United States, 7 Cir., 1915, 229 F. 960.

24. "[W]e are satisfied that this statute [19 U.S.C.A. § 1305(a)] * * * embraced only such articles as Congress would have denounced as immoral if it had understood all the conditions under which they were to be used." United States v. One Package, 2 Cir., 1936, 86 F.2d 737, 739. In the Roth case, the Supreme Court stated: "We perceive no significant difference between the meaning of obscenity developed in the case law and the definition of the A.L.I., Model Penal Code, § 207.10(2) (Tent. Draft No. 6, 1957) * * *." Roth v.

United States, 1957, 354 U.S. 476, 487, note 20, 77 S.Ct. 1304, 1 L.Ed.2d 1498. Section 207.10(4) (c) of the Draft provides that non-criminal dissemination of obscenity includes: "dissemination to institutions or individuals having scientific or other special justification for possessing such material."

25. United States v. One Package, 2 Cir., 1936, 86 F.2d 737.

26. At least in a case such as this, where the importer and those who will have access to the material are the same or of the same class and proven to have the same reaction to the material.

27. 35 Stat. 614 (1909), as amended, 21 U.S.C.A. § 173.

28. 21 C.F.R., Part 302 (1955).

29. The importation of such products for animal use is regulated by 37 Stat. 832 (1913), 21 U.S.C.A. § 151 et seq. Their importation for human use is regulated by 58 Stat. 702 (1944), 42 U.S.C.A. § 262. The former is more strictly regulated. See 9 C.F.R., Part 102 (1949); and compare 19 C.F.R. § 12.17 (1953), with 19 C.F.R. § 12.21 (1953).

the ban of the statute. The successive judicial interpretations of the statute here involved point as clearly to this result as does the express Congressional permission for the importation of potentially harmful biologic products. The work of serious scholars need find no impediment in this law.

The Government, in certain portions of its Memorandum of Law, talks of, and I find two cases[30] which have described material as being "obscene *per se.*" But I cannot understand this to mean that the material was held to have a prurient appeal without reference to any beholder. I take it to mean that in the cases under decision there was not shown to be anyone to whom the appeal would be other than prurient, or that in a case of widespread distribution the material was of such a nature that its appeal to the average person must be held, as a matter of law, to be prurient.[31] It should be obvious that obscenity must be judged by the material's appeal to somebody. For what is obscenity to one person is but a subject of scientific inquiry to another. And, of course, the substitution, required by Roth,[32] of the "average person" test (in cases of widespread distribution) for the test according to the effect upon one of particular susceptibility, is a matter of determining the person according to whom the appeal of the material is to be judged. Once it is admitted that the material's appeal to some person, or group of persons, must be used as the standard by which to gauge obscenity, I believe that the cases teach that, in a case such as this, the appeal to be probed is that to the people for whom, and for whom alone, the material will be available.

It is possible, instead of holding that the material is not obscene in the hands of the persons who will have access to it, to speak of a conditional privilege in favor of scientists and scholars, to import material which would be obscene in the hands of the average person.[33] I find it unnecessary to choose between these theories. In the first place, under either theory the material may not be excluded in this case. Moreover, I believe that the two theories are but opposite sides of one coin. For it is the importer's scientific interest in the material which leads to the conditional

30. United States v. Rebhuhn, 2 Cir., 109 F.2d 512, certiorari denied 1940, 310 U.S. 629, 60 S.Ct. 976, 84 L.Ed. 1399; United States v. Newman, 2 Cir., 1944, 143 F.2d 389. But the court in Rebhuhn also said: "Most of the books could lawfully have passed through the mails, if directed to those who would be likely to use them for the purposes for which they were written, though that was not true of one or two; for example, of that entitled, 'Sex Life in England', which was a collection of short and condensed erotic bits, culled from various sources, and plainly put together as pornography. * * * [W]e will assume * * * that the works themselves had a place, though a limited one, in anthropology and in psychotherapy. They might also have been lawfully sold to laymen who wished seriously to study the sexual practices of savage or barbarous peoples, or sexual aberrations; in other words, most of them were not obscene per se. In several decisions we have held that the statute does not in all circumstances forbid the dissemination of such publications, and that in the trial of an indictment the prosecution must prove that the accused has abused a conditional privilege, which the law gives him. [Citing Dennett, Ulysses, and Levine.] However, in the case at bar, the prosecution succeeded upon that issue, when it showed that the defendants had indiscriminately flooded the mails with advertisements, plainly designed merely to catch the prurient, though under the guise of distributing works of scientific or literary merit. We do not mean that the distributor of such works is charged with a duty to insure that they shall reach only proper hands, nor need we say what care he must use, for these defendants exceeded any possible limits; the circulars were no more than appeals to the salaciously disposed, and no sensible jury could have failed to pierce the fragile screen, set up to cover that purpose." 2 Cir., 1940, 109 F. 2d 512, 514–515.

31. See footnotes 14, 20, supra.

32. Roth v. United States, 1957, 354 U.S. 476, 488–489, 77 S.Ct. 1304, 1 L.Ed. 2d 1498.

33. See note 30, supra.

privilege, and it is this same interest which requires the holding that the appeal of the material to the scientist is not to his prurient interest and that, therefore, the material is not obscene as to him.[34]

There remain to be mentioned two objections which the Government raises to the course of decision I follow today. The first is that the second proviso of § 305(a) of the Tariff Act of 1930[35] provides the sole means by which this material may be imported. Of course, under the theory that the nature of the material is to be judged by its appeal to those who will see it, the libelled material is simply not obscene and the second proviso has no application, providing, as it does, for a method by which certain obscene matter may be imported.[36] And if the correct theory be that there is a conditional privilege in favor of scientists and scholars to import material, for their study alone, which would be obscene in the hands of the general public, I am not convinced that Congress, by enacting the second proviso to § 305(a) in 1930[37] intended to establish the Secretary's discretion as the sole means by which scientists could import such materials. Indeed, the cases decided since 1930 have not so held.[38]

The Government also raises a *concursus horribilium*, maintaining that there are no workable criteria by which the section may be administered if it is interpreted as I do today. *It is probably sufficient unto this case to point out that there is no dispute in this proceeding as to the fact that there is no reasonable likelihood that the material will appeal to the prurient interest of those who will see it.* But I will add that I fail to see why it should be more difficult to determine the appeal of libelled matter to a known group of persons than it is to determine its appeal to an hypothetical "average man."[39] The question is not whether the materials are necessary, or merely desirable for a particular research

---

34. It may be that the drafters of Tentative Draft No. 6 of the A.L.I. Model Penal Code have adopted both theories. § 207.10(4) (c) of the Draft, quoted in note 24, supra, creates a limited exception to the prohibition of dissemination of obscenity in favor of "institutions or individuals having scientific or other special justification for possessing such material." And § 207.10(2) of the Draft sets forth the class as to which the material's appeal shall be judged as follows: "Obscenity shall be judged with reference to ordinary adults, except that it shall be judged with reference to children or other specially susceptible audience if it appears from the character of the material or the circumstances of its dissemination to be specially designed for or directed to such an audience." It is possible to understand the term "specially susceptible" to include not only those who are specially more susceptible, but also those who are specially less susceptible. See Comment 9 to the Draft and page 38, note 59.

35. Quoted in note 9, supra.

36. I do not believe that my decision leaves the second proviso without function, for it appears to provide the only means by which classics, and works of scientific and literary merit, although obscene in

the hands of the general public, may be distributed to the general public.

37. The Congressional debates on § 305 (a), 72 Cong.Rec. 5414–33, 5487–5520 (1930), 71 Cong.Rec. 4432–4439, 4445–4472 (1929), are largely illustrative of the views of the members who spoke on literature which may contain salacious passages. While bits may be culled from these debates which appear to deal with the problem at issue here, I believe that a fair reading of the debates as a whole indicates that Congress was concerned with the widespread distribution of obscene matter, and with the manner in which the ban on such distribution was to be enforced.

38. See note 30, supra. And see Parmelee v. United States, 1940, 72 App.D.C. 203, 113 F.2d 729, 737: "It cannot reasonably be contended that the purpose of the pertinent statute is to prevent scientific research and education. * * * So to interpret it would be to abandon the field, in large measure, to the charlatan and the fakir." (Footnote omitted.) And see the excerpt from Ulysses quoted in note 21, supra.

39. Cf. Roth v. Goldman, 2 Cir., 172 F.2d 788, 792 (concurring opinion by Judge Frank), certiorari denied 1949, 337 U.S. 938, 69 S.Ct. 1514, 93 L.Ed. 1743.

project. The question is not whether the fruits of the research will be valuable to society.[40] The Tariff Act of 1930 provides no warrant for either customs officials or this court to sit in review of the decisions of scholars as to the bypaths of learning upon which they shall tread. The question is solely whether, as to those persons who will see the libelled material, there is a reasonable probability that it will appeal to their prurient interest.[41]

For those who would seek to pander materials such as those libelled in this case, I need hardly express my contempt. Nor need I add that the theory of this decision, rightly interpreted, affords no comfort to those who would import materials such as these for public sale or private indulgence. The cry against the circulation of obscenity raised by the law-abiding community is a legitimate one; and one with which Congress, the State legislatures, and the courts have been seriously concerned.[42] When that case arises in which the Government determines that it should go to trial upon the facts, a showing that multiple copies of a particular piece of matter are sought to be imported by the same person should

raise an extremely strong inference against any claim that the material is sought for allegedly scientific purposes. And, while I express no definitive opinion on this point, since it is unnecessary to the decision before me, it would seem that any individual, not connected with an institution recognized to be conducting bona fide research into these matters, will not easily establish that he seeks importation for a reason other than gratification of his prurient interest. See United States v. One Unbound Volume, etc., D.C.D.Md.1955, 128 F.Supp. 280.

Nor do I envision the establishment of myriad and spurious "Institutes for Sex Research" as screens for the importation of pornographic material for public sale. In addition to what has already been said, it should be pointed out that the *bona fides* of any such Institute and of the research or study to which it claims to be dedicated will be a threshold inquiry in each case. The accumulation of an inventory, as I mentioned above, will tend to negate the assertion of a legitimate interest. And those whose business it is to pander such material will be unlikely to convince anyone that

40. "All ideas having even the slightest redeeming social importance—unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion—have the full protection of the [Constitutional] guaranties, unless excludable because they encroach upon the limited area of more important interests. But implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance.

"* * * Sex, a great and mysterious motive force in human life, has indisputably been a subject of absorbing interest to mankind through the ages; it is one of the vital problems of human interest and public concern." Roth v. United States, 1957, 354 U.S. 476, 484, 487, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (footnote omitted). I believe that the statement above quoted concerning the rejection of obscenity must be interpreted in the light of the widespread distribution of the material in Roth. While I do not reach the constitutional issues posed by claimant in this case I may note that, since it is taken as proved in this case

that the libelled material will not, in all probability, appeal to the prurient interest of those into whose hands it will come, I cannot conceive of any interest which Congress might have intended to protect by prohibiting the importation of the material by the claimant.

41. The Government also maintains that the holding in United States v. One Obscene Book Entitled "Married Love," D.C.S.D.N.Y.1931, 48 F.2d 821, that a decision that a book is importable under § 305(a) is *res judicata* in a subsequent libel, precludes my holding that material is to be judged by its appeal to those who will see it. But the successive importations in that case were both for the purpose of distributing the book to the public at large. I see no reason for extending the rationale of the cited case beyond the situation in which the successive importations are for the purpose of distributing the material to the same person or class of persons.

42. See Roth v. United States, 1957, 354 U.S. 476, 485, 77 S.Ct. 1304, 1 L.Ed.2d 1498.

they are serious candidates for the mantle of scientific researcher.

There being no dispute in this case as to the fact that there is no reasonable probability that the libelled material will appeal to the prurient interest of those who will see it, it is proper that the motion of the libellant for an order that the libelled material be forfeited, confiscated and destroyed, be denied; and that the motion of the claimant for summary judgment dismissing the libel and releasing the libelled material to it, be granted.

Settle order on notice.